IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

JUN - 4 2002

CLERK, U.S. DISTRICT COURT
By _____ Deputy

| | |
|---|---|
| DR. GERRY HOLLAND, DO § <br> MS. CYNTHIA LaGRONE, § <br> DR. ROMEO B. SANGALANG, MD § <br> DR. STEVE ELSTON, MD § <br> DR. JERRY STRECKER, PhD § <br> DR. GLORIA TRIROGOFF, MD § <br> DR. ED QUIROS, MD AND § <br> DR. C.P. QUIROS, MD § <br>              **Plaintiffs** § <br> § <br> v. § <br> § <br> MR. NORMAN LAMBERT, as § <br> CEO of Golden Plains Community § <br> Hospital and Individually, § <br> DR. OTONIEL HUERTAS, § <br> DR. JESSE PERALES, § <br> DR. BRET TIMMONS, § <br> DR. WALLY MANN, § <br> DR. JOHN A. RIBEIRO, § <br> DR. BASIL A. YOUNIS, § <br> DR. VIC MAZA, § <br> DR. BARD ROGERS, § <br> DR. CARMEN PURL § <br> MS. KATHY O'KEEFE, § <br> MEMBERS OF THE BOARD OF § <br> GOLDEN PLAINS COMMUNITY § <br> HOSPITAL MARK HEADLEY, § <br> JOHN RIBEIRO, CONNNIE FRERIKS, § <br> TOM ZENI, JOE FRANK WHEELER, § <br> RAUL PULLMAN, § <br> NORM LAMBERT, § <br> Individually. § <br>              **Defendants** § | CIVIL ACTION NO._____ <br><br> 2-02CV-0157J |

### PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

1

NOW COME Dr. Gerry Holland, Dr. Jerry Strecker, Ms. Cynthia La Grone, Dr. C.P. Quiros, Dr. Ed Quiros, Dr. Goria Trirogoff, Dr. Steve Elston. Dr. Romeo Sangalang (hereinafter referred to as "Plaintiffs"), and file this, their ORIGINAL COMPLAINT, and for cause of action would show as follows:

## I. PARTIES

1. Plaintiff, DR. GERRY HOLLAND, is an individual currently residing in 101 Salina, Borger, Hutchinson County, Texas

2. Plaintiff, DR. JERRY SYRECKER is an individual currently residing in 189 Clubhouse Dr., Fritch, Hutchinson County, Texas.

3. Plaintiff, MS. CYNTHIA LaGRONE, is an individual currently residing in Borger, Hutchinson County, Texas.

4. Plaintiff, DR. C.P. QUIROS, is an individual currently residing in 118 Lakeview H, Borger, Hutchinson County, Texas.

5. Plaintiff, DR. ED QUIROS, is an individual currently residing in 118 Lakeview H, Borger, Hutchinson County, Texas.

6. Plaintiff, DR. GLORIA TRIROGOFF, is an individual currently residing in Pampa Regional Medical Center, One Medical Plaza, Pampa, Grey County, Texas.

7. Plaintiff, DR. STEVE ELSTON, is an individual currently residing in 1401 Bluebonnett H, Borger, Hutchinson County, Texas.

8. Plaintiff, DR. ROMEO B. SANGALANG, is an individual currently residing in 104 Timberlake, Borger, Hutchinson County, Texas.

9. Defendant, MARK HEADLEY is an individual who may be served with process at 101 at 101 Blommaert, Borger, Texas 79007

10. Defendant, MR. NORMAN LAMBERT is an individual who may be served with process at 200 S. McGee, Borger, Texas 79007

11. Defendant, DR. OTONIEL HUERTAS is an individual who may be served with process at 104 N. Bryan, Borger, Texas 79007.

12. Defendant, DR. JESSE PERALES is an individual who may be served with process at 202 S. McGee, Borger, Texas 79007.

2

13. Defendant, DR. BRET TIMMONS is an individual who may be served with process at 104 N. Bryan, Borger, Texas 79007.

14. Defendant, DR. WALLY MANN is an individual who may be served with process at 202 S. McGee, Borger, Texas 79007.

15. Defendant, DR. JOHN A. RIBEIRO is an individual who may be served with process at 200 S. McGee, Borger, Texas 79007.

16. Defendant, DR. BASIL A. YOUNIS is an individual who may be served with process at 200 S. McGee, Borger, Texas 79007 .

17. Defendant, DR. VIC MAZA is an individual who may be served with process at 200 S. McGee, Borger, Texas 79007.

18. Defendant, DR. BARD ROGERS is an individual who may be served with process at 202 S. McGee, Borger, Texas 79007.

19. Defendant, DR. CARMEN PURL is an individual who may be served with process at 200 S. McGee, Borger, Texas 79007.

20. Defendant CONNIE FRERIKS is an individual who may be served with process at P.O. Box 861, Stinnet, Texas 79083

21. Defendant JOE FRANK WHEELER is an individual who may be served with process as 613 North Main, Borger, Texas, 79007.

22. Defendant PAUL RULLMAN is an individual who may be served with process at 205 Tumbleweed, Borger, Texas, 79007.

23. TOM ZENI is an individual who may be served with process at 114 Lakeview Dr, Borger, Texas, 79007.

## II. VENUE

20. Venue is proper because the acts giving rise to this cause of action took place in Hutchinson County, Texas. Jurisdiction is specifically conferred on the court by 15 U.S.C. § 15, 42 U.S.C 2000e-5 (F)(3) and the Constitution of the United States.

## III. FACTUAL BACKGROUND

IV.

21. Plaintiffs Sangalang, Strecker, Holland, Elston, Trirogoff, and Quiros (hereinafter "Plaintiff Doctors") are doctors who hold private practices in Borger, Texas.

22. These doctors were recruited by the Borger Hospital between 1977 and 1994.

23. Since being recruited, Plaintiff Doctors have worked at the hospital as needed. None of the Plaintiff Doctors except Trirogoff received any salary. Trirogoff's agreement with the hospital was that she would receive a minimal compensation in exchange for being on call, 24 hours/day for any emergency requiring anesthesia, in addition to serving doctors requesting her service.

24. The Hospital is a rural hospital with 99 beds and funded by taxpayers of Hutchinson County.

25. The hospital had been having financial difficulties for quite some time, so much so that it was forced to shut down on 1988-1989, and remained closed for several months. It reopened on November 1989 as a Hospital District funded by the tax payers of Hutchinson County and general revenues.

26. The Medical Executive Committee (hereinafter "MEC") is a peer review committee organized by the Hospital, consisting of doctors with considerable experience, who are elected and appointed representatives of the hospital staff.

27. The purpose of the MEC is to review questions as to practices that took place, and ascertain whether any questionable or incorrect medical care was given.

28. Doctors Holland, Sangalang, C.P. and Quiros, Elston and Trirogoff were members of the MEC until December 31, 2001.

29. On or about November of 1996, the Hospital hired Norman Lambert as its Chief Executive Officer (hereinafter "CEO").

30. Immediately upon his arrival in Borger, Lambert instructed the Emergency Room Group to exclude from the Emergency Room Schedule, Dr. Juan Viola, a Filipino doctor who worked as an Emergency Room Physician.

31. Lambert's reason for firing Viola was that Dr. Viola was not of their kind and/or did not fit in the community.

32. On May 12, Lambert offered the position of CFO to Larry Langley, effective June 9, 1997 at a salary of $72,000.00 and a generous severance package if not terminated for cause.

4

33. In order to deal with the Hospital's financial crisis, Lambert froze and later cut salaries, and cut hours of many workers to 32 hours per week, commencing on June 26, 1997.

34. The period of austerity lasted from June 26, 1997, when Lambert instituted his Financial Action Plan, until May of 1998.

35. During the time of financial austerity, however, Lambert himself sought and received a bonus and raises.

36. In May of 1998, Lambert decided to revamp the hospital. He decided to hire six new doctors, and grant them guaranteed salaries of between $165,000 and $350,000 per year, in addition to bonuses, paying of their student loans, paid offices and staff. Five of the six recruited doctors left the hospital at the end of one year, notwithstanding the lucrative and generous recruitment packages. In the year 2000 six new doctors were recruited by Lambert.

37. Except for 2 physicians, the doctors hired by Lambert in 1998 and 2000, were Caucasian.

38. In May of 2000, the hospital's was burdened with a financial deficit of approximately two million dollars ($ 2,000,000.00).

38. Lambert and the other defendants conspired to prevent protests regarding the mismanagement of the hospital.

39. Defendants also conspired to monopolize the medical care business in Borger.

40. Lambert was motivated to take such actions by his dislike of Filipinos.

41. All of the Defendants were further motivated by financial gain.

42. In furtherance of these goals, Defendants conspired to prevent the Plaintiff doctors from obtaining & treating patients, spread rumors that they were closing their practices, filed and caused to be filed false complaints, initiated repeated investigations into Plaintiff Doctors' medical practices, and referred patients only to the new doctors.

44. Further, the license to the Borger Rural Health Clinic, property of the Hospital District, was given to Defendant Timmons by selling it on paper for a negligible amount and then granting Timmons additional monies to cover the negligible amount allegedly paid by him. No other physicians were offered the same opportunity and the property of the District was sold secretly.

45. By the year 2000, the public learned the Langley and Lambert had bought a magnetic Resonnance Imaging Machine at a cost to the citizens of the county of $ 615,000.00. The machine was bought sought sight unseen. When it did arrive it was a non-working refurbished machine.

44. Plaintiffs became increasingly frustrated with the mismanagement of the Hospital, and began speaking out. Lambert, through Langley threatened to fire hospital employees who spoke to the Human Resources representative during office hours, and told board members they were prohibited from discussing things said in open meetings.

45. CFO Langley, under the control of Lambert, attempted to prevent dissemination of information and all protest. The Board was complicit in this maneuve

46. In February, 2000, Langley tendered his resignation to the Hospital. He was paid severance equal to eight months of salary.

47. The reason for his separation termination was maintained secret by Lambert in conspiracy with Hospital Attorney Leon Mitchell.

48. Lambert gave a sealed envelope to LaGrone, and ordered her to keep it hidden and unsealed. The envelope was subsequently retrieved by Leon Mitchell.

49. Lambert jealously protected his supporters and attacked his detractors.

50. Lambert's zealousness was so strong that when Langley was found to have obtained child pornography using the Hospital's computers, he arranged to have him given severance pay, did not report the matter to the police, and gave the evidence, sealed in an envelope, to LaGrone with instructions to keep it. Lambert did so without disclosing to LaGrone the contents of the envelope, and in concert with the Hospital Attorney Leon Mitchell. The circumstances of the terminated employee's termination were kept secret. It became public by accident when citizens of the county met with the District Attorney and the facts became known. After FBI and the local authorities looked into the matter, Langley was indicted on many federal felony charges.

51. In 2001 when the members of the MEC learned of the events and the real reason Langley left the hospital, they were outraged and published a notice in the local paper stating that no one had been informed that the matter under investigation was Child Pornography.

52. Defendant Bard Rogers responded through the newspapers that the members of the MEC were aware of the facts and were now getting around to raising it for personal gain. Rogers published statements impugning the character of the members of the MEC were

knowingly false.

53  The specific factual allegations are more completely described below. All of the facts alleged in the Section titled "Causes of Action" are incorporated herein by reference, as though fully stated herein.

## IV. CAUSES OF ACTION

Plaintiffs incorporate all previous paragraphs as though fully stated herein in each subsection. The causes of action are as follows, and their factual bases include, but are not limited to the facts cited therein:

1. DEFAMATION: Defendants committed Common Law Defamation, Slander, Libel, and Business Disparagement in that:

    a. On or about June 5, 2001, Defendants Huertas, Mann, Perales, Purl, Ribeiro, Rogers, Timmons, Maza and Younis sent a letter to the Board, in which they accused the members of the MEC of conspiring to exclude new doctors, and of working contrary to the welfare of their patients. A summary of the letter was published in the Borger News Herald on or about June 8, 2001.

    b. On or about July 27, 2001, some or all of Defendants caused an article to appear in the Borger News Herald with a headline reading "Sangalang Guilty of Malpractice". However, jury found some negligence and no damages. The ruling was a take-nothing judgment.

    c. On or about September 4, 2001, Defendant O'Keefe, an employee of Golden Plains Community Hospital, filed a complaint with the Texas Department of Health claiming that an individual whose name she did not know had accused Dr. Strecker of being a "pervert". Ms. O'Keefe also said that two (2) other women had reported similar incidents, but did not state the name of the other purportedly accusing women. She published this information orally to third parties. No disciplinary action was taken by the Department of Health after duly investigating the allegations.

    d. On or about September 12, 2001, Defendant Lambert told the Board of Directors of the Hospital that Dr. Holland had committed acts which constituted abandonment of her patients on the previous weekend. However, Holland had had no patients at the Hospital on the weekend in question.

    e. On or about October of 2001, Defendant Lambert published defamatory

statements accusing Plaintiff Trirogoff of refusing to treat a patient in an emergency, and of breaching a valid contract with the Hospital. These accusations were false. The incident referred to was not an emergency, and the contract referred to had expired over ten (10) years before.

f. On or about January 17, 2002, shortly after the other charge was dismissed by the Texas Department of Health, Defendant O'Keefe induced another individual to make a complaint of sexual impropriety against Dr. Strecker.

The defamatory statements made by Defendants were false. Defendants were motivated to make these statements by malice. They were not privileged to make any of these statements. The statements made would tend to injure their reputations, expose them to public hatred, contempt, ridicule, and financial injury, and impeach their honesty, integrity, virtue, and reputations. Plaintiffs who were falsely accused of wrongdoing were damaged as a result, in that they lost income (patients left them), and time during which they could have been earning money (negating the false accusations). In addition, the involvement in this controversy has decreased their earning capacity. Plaintiffs have also suffered emotional damage as a result of Defendants' defamatory statements.

2. INTERFERENCE WITH CONTRACTUAL RELATIONS. Defendants committed acts of Interference with Prospective Business Relationships, Interference with Existing Contractual Relations, and Conspiracy to Commit Tortious Interference in that:

a. On or about October 29, 2001, Ms. Cora Moss brought her injured son to the Hospital. Ms. Moss became unhappy with the treatment her son was being given, and requested from an employee of Hospital that Dr. Sangalang be contacted. Ms. Moss's request was refused. Such action was independently wrongful, as Dr. Sangalang's agreement with the Hospital provided that he would be allowed to see his patients there. Plaintiff suffered actual harm, in that the patient received a delay of treatment and was placed in jeopardy, This harm was the direct result of Defendants' actions.

b. On or about 2001, the Hospital, at the direction of Lambert and the Board, began requiring that all doctors who performed services at the Hospital designate a person to provide patients with anesthesia. They were asked to choose between Dr. Trirogoff, a medical doctor specializing in anesthesia, and Chuck Flinko, a Certified Registered Nurses Assistant employed by the Hospital, to provide them with anesthesia. Henceforth, clients who required anesthetization were not given

a choice of whether to use a doctor or a nurse for this delicate procedure. The Defendant Doctors all chose Mr. Flinko rather than Dr. Trirogoff. As the Defendant Doctors had, by this time, successfully excluded Plaintiff Doctors from most medical procedures at the Hospital, Dr. Trirogoff was left with little or no work to do. Tririgoff was damaged as a direct result of Defendants' actions.

3. WRONGFUL DISCHARGE.

Plaintiff LaGrone has been employed with Defendant Hospital since January 7, 1997. In January, 2001 she became the Hospital's risk manager and compliance officer. In that capacity, she was charged with the duties of reviewing the Hospital's policies and actions, making sure they were in compliance with the law, reviewing any potential liability of the hospital, and advising it as to suggested actions to take. Every hospital, no matter how large or small, has a risk manager. It is common practice with many hospitals to have the risk manager/compliance officer report directly to the board in order to avoid any potential for conflict with those persons whose actions are being scrutinized. She was an exemplary employee during the entire time, earning many awards including the CEO award in 1998, the Good Attendance Award in 1998, 1999, 2000, and 2001, the Team Excellence Award in 1997, and the CTC Recognition Award in 1998.

Larry Langley was hired as the Hospital's CFO on or about May of 1997. On or about January 28, 2000 Langley resigned, effective February 25, 2000. Defendant Lambert refused to answer the questions of the President of the Board as to why Langley had resigned. Norm Lambert approved Langley's resignation, and awarded him severance pay in accordance with his contract. Shortly before this, the Lambert brought Plaintiff LaGrone a sealed envelope, with instructions to leave it sealed, but to keep it. It was placed in her safe. LaGrone did as she was told. On or about February 2, 2001, one year later, Holland, learned that Langley was forced to resign because he was found to have downloaded pornographic images of young children on the hospital's computers, in violation of the penal laws of the United States and the State of Texas. Plaintiff Holland asserted the need to report the incident to the police, but Lambert said Leon Mitchell, the Hospital's attorney, was attending to the matter. In fact, Mitchell retrieved the envelope which held the evidence of criminal actions from the safe of Ms. LaGrone. He concealed the evidence until confronted by the District Attorney and never turned it over to the authorities.

On or about May 8, 2001, an article was published in the local newspaper exposing the reason for Langley's resignation. Mitchell admitted to the District attorney that he had

9

been complicit in secreting the evidence. Only then did LaGrone realize that the envelope she had been given contained the child pornography Langley had downloaded. On or about May 9., 2001, LaGrone, very upset about this, and contacted the Texas Nurses Association for advise concerning her duties and potential liability. She informed Melody Henderson, Lambert's assistant, and Chief Operation Officer, and the MEC about this, and of her intent to cooperate in any criminal investigation of the matter. On or about six days later, May 15, 2001, LaGrone was told that the position of Quality/Risk Manager had been eliminated. On or about July 7, 2001, Langley surrendered to the police.

    a.    LaGrone was terminated in retaliation for her refusal to perform an illegal act for which she could be held liable by hiding evidence and by knowingly possessing child pornography.

    b.    In addition to this claim brought under the narrow scope of *Sabine Pilot*, LaGrone has completed the administrative process and timely filed a charge of Discrimination and retaliation with the EEOC More than 180 days have passed, and EEOC has not dismissed the matter or issued its right to sue letter.

4.    **ABUSE OF PROCESS**

    a.    The Hospital had a Peer Review process whereby unresolved cases and questionable circumstances of medical care may be reviewed by doctors other than the treating physician, in order to determine whether proper care was given. The process is properly arbitrarily changed in January 2002. This current review process may be initiated by the Board of Directors, the Chief Executive Officer, or any physician at the hospital. The Hospital, Defendant Doctors and staff have have utilized this process in order to harass Plaintiffs, suddenly commencing per review of files that were either already reviewed, old or meritless.

         Since 2001, Holland has had two (4) files peer reviewed, Ed Quiros had four (4) files reviewed, Trirogoff had two(2) files reviewed and Sangalang has had seven(7) files reviewed. The matter in which a take-nothing judgment was rendered was reviewed twice, the first time after suit was filed, and the second time after judgment was rendered. Few of the Defendant doctors have had their files peer-reviewed, despite multiple reported allegations of serious medical occurrences on their parts. Defendants have instructed staff to review all of Plaintiff Doctors' files, in order to attempt to find files in which any questionable

       practices took place. The same instructions were not given for Defendant Doctors' files.

b.   On or about January 17, 2002, Defendant O'Keefe, a social worker employed by the Hospital, induced a person who was not her patient or client to make a complaint with the Texas Department of Health of sexual impropriety against Dr. Strecker. This claim had already been refused by another agency.

c.   On or about September 4, 2001, Defendant O'Keefe filed a complaint with the Texas Department of Health accusing Dr. Strecker of being a "pervert", although she did not know the identity of the individual allegedly reporting these acts. To bolster her credibility, and with malicious intent, Ms. O'Keefe also said that two (2) other women whose names she also ignored, had reported similar incidents.

Defendants were motivated to commit the acts cited above by malice, a desire to injure the Plaintiffs involved, and to eliminate them as competition. The Plaintiffs involved were damaged as a result.

5.   CONSTITUTIONAL CLAIMS: §1983

    a.   VIOLATION OFF FIRST AMENDMENT RIGHT OF FREE SPEECH

        i.   In the year 2000, an employee expressed concern that the technicians in the Rehabilitation Department at the hospital were being insufficiently trained, that patient's welfare was being compromised. After voicing this concern, the employee Theresa Thomas was given a written reprimand. The welfare of patients is a matter of public concern, and no damage to efficiency at the Hospital resulted from the expression of concern.

        ii.   On or about 2001, Lambert told Strecker that he was not to discuss any matters discussed by the board, as it was illegal to do so. On February, 2002, Strecker did raise the issue of confidentiality with District Attorney Clay Ballman who advised Dr. Strecker that this was in fact a lie as it was not illegal. As Strecker became more vocal about the occurrences he observed and the criminal acts of Langley became public, Strecker was repeatedly reprimanded by members of the Board, the administration and threatened with legal action by Leon Mitchell.

        iii.   Defendants were constantly attempting to force Plaintiffs to cease their

protests over the mismanagement in the hospital.

* On or about February 2, 2001, an interview with Defendant Ribeiro appeared in the newspaper, in which Ribeiro stated that certain individuals or groups of individuals attempted to create turmoil for others, almost as if they secretly delighted in the misfortunes of others.

* On or about April 20, 2001, Defendant Lambert wrote an open letter, in which he stated that "certain individuals" had become criminal in their efforts to discredit the administration and Dr. Ribeiro. He stated that those persons had lied and falsified documents. He also made accusations of trespass. On or about April 26, 2001, on inquiry by LaGrone, Lambert confirmed to Plaintiff LaGrone that neither she or her limited staff were those he was accusing of these actions.

* On or about May 9, 2001, Plaintiff LaGrone informed Lambert's assistant that she would cooperate with the criminal investigation against Lambert. She was fired six days later.

b. **EQUAL PROTECTION**

   i. Plaintiff LaGrone, a woman, was treated differently than the similarly situated male Hospital employees and other female administrative members She was paid significantly less than similarly situated male and female administrative Hospital employees, was not notified of meetings that would take place, and was not provided with documents provided others of her level.

   ii. Plaintiffs Sangalang, Trirogoff, E. Quiros, and C.P. Quiros[1] (hereinafter "the Phillipino Doctors") are of Phillipino descent. Defendant Lambert exhibited his dislike for persons of Phillipino descent when he terminated Dr. Vilao's employment and refused an applicant sent by the recruitment agency as he was Philipino. He sought only a Caucasian employees. Plaintiffs Holland, C.P. Quiros, and Trirogoff (hereinafter "the Female Doctors") are women. All of the Plaintiffs are over the age of 50. The

       Plaintiff Doctors have always had agreements with the Hospital to work as independent contractors, paid directly by patients, and only for work done. Majority of the Defendant Doctors are all Caucasian men, under the age of 40, hired as employees with guaranteed salaries of between $165,000 and $350,000 per year, in addition to bonuses, student loan pay-offs, paid offices, and staff. There was no rational basis for giving these exceedingly different agreements to the Plaintiffs and Defendants. Defendants Lambert and the Hospital were so desperate to rid the Hospital of Plaintiff Doctors that they acted in contravention to the interest of the Hospital in order to attract Defendant Doctors. Defendant Lambert acted knowingly, and directly participated in violating the Phillipino Doctors', the (old) Plaintiff Doctors', and the Female Doctors' constitutional rights.

   iii.    Dr. Gerry Holland, was removed as of December 2001 from the Women and Children's Clinic and replaced by Dr. Rogers and Dr. Mann.

8. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

   a.    Defendant O'Keefe intentionally inflicted emotional distress upon Strecker as heretofore set forth. By making and causing to be made false and malicious allegations of improper patient care by Dr. Strecker with the Texas Department of Health.

       The making of these statements was an extreme and outrageous act, which Ms. O'Keefe knew or had reason to know would cause Dr. Strecker extreme emotional distress. These statements did, in fact, cause him extreme emotional distress, and Strecker suffered damages as a result.

   b.    Defendant Lambert intentionally inflicted emotional distress upon Plaintiff Physicians in that he caused a memorandum to be written on or about March 19, 2001 in which it was stated that one or more female employees had complained of improper sexual conduct by one or more medical staff members. The memorandum was purportedly addressed to all of the physicians, but was only distributed to Plaintiff Physicians without envelopes. This action implied that Plaintiff Physicians were the persons against whom the complaint was filed, and this implication was made known to all of the staff at the Hospital. Lambert

Case 2:02-cv-00157-J   Document 1   Filed 06/04/02   Page 14 of 16   PageID 14

caused the memorandum to be written and distributed in this manner with the intent or knowledge that his actions would result severe emotional distress on the parts of Plaintiff Physicians His actions were extreme and outrageous. As a result of this action of Lambers, Plaintiffs suffered damages, personally and professionally.

9.  ANTITRUST: SHERMAN ACT

Plaintiffs incorporate all of the aforegoing allegations and facts as though fully stated herein. The Hospital is the only hospital in Borger, Texas. The higher (tertiary) next closest hospital is in Amarillo, which is 50 miles away. Though when the Hospital has suffered from a poor reputation many Borger residents chose to go to other hospitals when possible, this has resulted in high risk to patients .There is no practical alternative to treatment in the Hospital, especially in urgent situations.

As Defendant Doctors are financially supported by the Tax payer's of Hutchinson County, while Plaintiff Doctors do not, it is in the Hospital's best interest to discourage patients from utilizing the services of Plaintiff Doctors. Defendant Doctors, furthermore, have an in interest in preventing patients from utilizing the services of Plaintiff Doctors, in that their long-term financial stability would be increased or cemented and enhanced from the lack of any competition.

Defendants Lambert, Huertas, Perales, Timmons, Mann, Ribeiro, Younis, Maza, Rogers, Purl, and the Hospital violated the Sherman Act, 15 U.S.C. §1 et seq, committing antitrust violations. They acted in a concerted effort to restrain trade by attempting to exclude Plaintiff doctors from practicing at the Hospital , as shown above, in a concerted effort to take business from Plaintiffs, in the hopes of forcing Plaintiff Doctors to close their practices, which resulted in an unreasonable restraint on trade, in that the residents of Borger, Hutchinson County, Texas were unable or less able to make a choice as to their medical providers. These actions were not legitimate. The actions had anticompetitive effects, or, alternatively, this practice should be prohibited as imposing an unreasonable restraint on competition. Plaintiff Doctors have been severely damaged as a result, as they have lost much of their income.

10. CONSPIRACY TO MONOPOLIZE

Plaintiffs incorporate all of the aforegoing allegations and facts as though fully stated herein. Defendants intended to monopolize all of the medical care business in Borger, Texas. They wanted to prevent any other doctor, including and especially the Plaintiff

financial incentives and rewards by Lambert, and the Board, paid for by general revenue. If forced to leave Borger, Texas, the Plaintiff Doctors may be forced to leave the State of Texas.

## V. ATTORNEY'S FEES

It was necessary for Plaintiffs to secure the services of Alicia A. Wilde and Bill Cornett, licensed attorneys, to prepare and prosecute this suit. For services rendered, judgment for attorney's fees and expenses though final judgment after appeal should be granted against Defendants and in favor of Plaintiffs for the use and benefit of Plaintiffs' attorney; or, in the alternative, Plaintiffs request that reasonable attorney's fees and expenses through final judgment after appeal be taxed as costs and be ordered paid directly to Plaintiffs' attorney, who may enforce the order for fees in the attorney's own name.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that Defendants be cited to appear and answer herein; and that upon final hearing hereof, Plaintiffs have judgment against Defendants as for the following:

i. Plaintiffs' actual damages for lost past income;

ii. Plaintiffs' expected lost future income;

iii. Plaintiffs' damages for emotional distress;

iv. Plaintiffs' damages for other actual damages

v. exemplary damages;

vi. reasonable attorney fees;

vii. injunctive relief;

viii. post-judgment interest and costs; and

ix. such other and further relief to which Plaintiff may be justly entitled.

Respectfully Submitted,

*/s/ Alicia Wilde p.c.*

Alicia Wilde
ALICIA A. WILDE, P.C.
4113 Marathon Boulevard
Austin, Texas 78756
SBN 01133050

*/s/ Bill Cornett*

Bill Cornett
Cornett Law Firm, P.L.L.C.
612 S. Van Buren
Amarillo, Texas 79101
SBN 04835200

Attorneys for Plaintiffs

16