IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION



DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

SEP 3 0 2002

CLERK, U.S. DISTRICT COURT
By _____
Deputy

| | | |
|---|---|---|
| DR. GERRY HOLLAND, DO | § | |
| MS. CYNTHIA LaGRONE, | § | |
| DR. ROMEO B. SANGALANG, MD | § | |
| DR. STEVE ELSTON, MD | § | |
| DR. JERRY STRECKER, PhD | § | |
| DR. GLORIA TRIROGOFF, MD | § | |
| DR. ED QUIROS, MD and | § | |
| DR. C.P. QUIROS, MD | § | |
| | § | |
| *Plaintiffs* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2-02CV-0157J |
| MR. NORMAN LAMBERT, as | § | |
| CEO of Golden Plains Community | § | |
| Hospital and Individually, | § | |
| DR. OTONIEL HUERTAS, | § | |
| DR. JESSE PERALES, | § | |
| DR. BRET TIMMONS, | § | |
| DR. WALLY MANN, | § | |
| DR. JOHN A. RIBEIRO, | § | |
| DR. BASIL A. YOUNIS, | § | |
| DR. VIC MAZA, | § | |
| DR. BARD ROGERS, | § | |
| DR. CARMEN PURL | § | |
| MS. KATHY O'KEEFE, | § | |
| MEMBERS OF THE BOARD OF | § | |
| GOLDEN PLAINS COMMUNITY | § | |
| HOSPITAL MARK HEADLEY, | § | |
| JOHN RIBEIRO, CONNIE FRERIKS, | § | |
| TOM ZENI, JOE FRANK WHEELER, | § | |
| RAUL RULLMAN, | § | |
| KATHY WHELCHEL, and | § | |
| MELODY HENDERSON, | § | |
| Individually. | § | |
| *Defendants* | § | |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

**TO THE HONORABLE JUDGE OF SAID COURT:**

*29*

NOW COME Dr. GERRY HOLLAND, Dr. JERRY STRECKER, Ms. CYNTHIA LaGRONE, Dr. C.P. QUIROS, Dr. ED QUIROS, Dr. GLORIA TRIROGOFF, Dr. STEVE ELSTON. Dr. ROMEO SANGALANG (hereinafter referred to as "Plaintiffs"), and file this, their FIRST AMENDED COMPLAINT, and for cause of action would show as follows:

## PARTIES

1. Plaintiff, DR. GERRY HOLLAND, is an individual currently residing in 101 Salina, Borger, Hutchinson County, Texas.

2. Plaintiff, DR. JERRY STRECKER is an individual currently residing in 189 Clubhouse Dr., Fritch, Hutchinson County, Texas.

3. Plaintiff, MS. CYNTHIA LaGRONE, is an individual currently residing in Borger, Hutchinson County, Texas.

4. Plaintiff, DR. C.P. QUIROS, is an individual currently residing in 118 Lakeview H, Borger, Hutchinson County, Texas.

5. Plaintiff, DR. ED QUIROS, is an individual currently residing in 118 Lakeview H, Borger, Hutchinson County, Texas.

6. Plaintiff, DR. GLORIA TRIROGOFF, is an individual currently residing in Pampa Regional Medical Center, One Medical Plaza, Pampa, Grey County, Texas.

7. Plaintiff, DR. STEVE ELSTON, is an individual currently residing in 1401 Bluebonnett H, Borger, Hutchinson County, Texas.

8. Plaintiff, DR. ROMEO B. SANGALANG, is an individual currently residing in 104 Timberlake, Borger, Hutchinson County, Texas.

9. Defendant, MARK HEADLEY is an individual who may be served with process at 101 Blommaert, Borger, Texas 79007.

10. Defendant, MR. NORMAN LAMBERT is an individual who may be served with process at 200 S. McGee, Borger, Texas 79007.

11. Defendant, DR. OTONIEL HUERTAS is an individual who may be served with process at 104 N. Bryan , Borger, Texas 79007.

12. Defendant, DR. JESSE PERALES is an individual who may be served with process at 202 S. McGee, Borger, Texas 79007.

13. Defendant, DR. BRET TIMMONS is an individual who may be served with process at 104 N. Bryan, Borger, Texas 79007.

14. Defendant, DR. WALLY MANN is an individual who may be served with process at 202 S. McGee, Borger, Texas 79007

15. Defendant, DR. JOHN A. RIBEIRO is an individual who may be served with process at 200 S. McGee, Borger, Texas 79007.

16. Defendant, DR. BASIL A. YOUNIS is an individual who may be served with process at 200 S. McGee, Borger, Texas 79007.

17. Defendant, DR. VIC MAZA is an individual who may be served with process at 200 S. McGee, Borger, Texas 79007.

18. Defendant, DR. BARD ROGERS is an individual who may be served with process at 202 S. McGee, Borger, Texas 79007.

19. Defendant, DR. CARMEN PURL is an individual who may be served with process at 200 S. McGee, Borger, Texas 79007.

20. Defendant CONNIE FRERIKS is an individual who may be served with process at P.O. Box 861, Stinnet, Texas 79083.

21. Defendant JOE FRANK WHEELER is an individual who may be served with process as 613 North Main, Borger, Texas, 79007.

22. Defendant PAUL RULLMAN is an individual who may be served with process at 205 Tumbleweed, Borger, Texas, 79007.

23. Defendant, TOM ZENI is an individual who may be served with process at 114 Lakeview Dr, Borger, Texas, 79007.

24. Defendant, KATHY WHELCHEL, is an individual who may be served with process at 200 S. McGee, Borger, Texas 79007.

25. Defendant, MELODY HENDERSON, is an individual who may be served with process at 200 S. McGee, Borger, Texas 79007.

## VENUE

26. Venue is proper because the acts giving rise to this cause of action took place in Hutchinson County, Texas. Jurisdiction is specifically conferred on the court by 15 U.S.C. § 15, 42 U.S.C. 2000e-5 (F)(3) and the Constitution of the United States.

## BACKGROUND

27. Plaintiffs HOLLAND, SANGALANG, ELSTON, STRECKER, TRIROGOFF, ED QUIROS and C.P. QUIROS ("Plaintiffs Doctors") are doctors who hold private practices in Borger, Texas.

28. These doctors were recruited by the Borger Hospital between 1977 and 1994.

29. Since being recruited, Plaintiff Doctors have worked at the hospital as needed. None of the Plaintiff Doctors except TRIROGOFF received any salary. However, Plaintiff Doctors received privileges to see, attend to, and treat patients at the Hospital. TRIROGOFF's agreement with the hospital was that she would receive a minimal compensation in exchange for being on call, 24 hours/day for any emergency requiring anesthesia, in addition to serving doctors requesting her service.

30. The Hospital is a rural hospital with 99 beds and funded by taxpayers of Hutchinson County.

31. The Hospital was forced to shut down on 1988-1989, and remained closed for several months. It reopened as the Hutchinson County Hospital District, enacted by the legislature of the State of Texas in 1989 and funded by the taxpayers of Hutchinson County.

32. The Medical Executive Committee (hereinafter "MEC") is a peer review committee organized by the Hospital, consisting of doctors with considerable experience, who are elected and appointed representatives of the Hospital staff.

33. The purpose of the MEC is to review questions as to practices that took place, and ascertain whether any questionable or incorrect medical care was given.

34. Doctors HOLLAND, SANGALANG, ELSTON, TRIROGOFF, C.P. and ED QUIROS, were members of the MEC until December 31, 2001.

35. On or about November of 1996, the Hospital hired NORMAN LAMBERT as its Chief Executive Officer (hereinafter "CEO").

36. Immediately upon his arrival in Borger, LAMBERT instructed the Emergency Room Group to exclude from the Emergency Room Schedule, Dr. Juan Viola, a Filipino doctor

who worked as an Emergency Room Physician. He also made comments to Hospital Employees, that the first thing he needed to do was "get rid of all the Filipino Doctors."

37.    LAMBERT's reason for firing Viola was that Dr. Viola was not of their kind and/or did not fit in the community.

38.    On May 12, LAMBERT offered the position of CFO to LARRY LANGLEY, effective June 9, 1997 at a salary of $72,000.00 and a generous severance package if not terminated for cause.

39.    In order to deal with the Hospital's financial crisis, LAMBERT froze and later cut salaries, and cut hours of many workers to 32 hours per week, commencing on June 26, 1997.

40.    The period of austerity lasted from June 26, 1997, when LAMBERT instituted his Financial Action Plan, until May of 1998.

41.    During the time of financial austerity, however, LAMBERT himself sought and received a bonus and raises of over $27,000.00.

42.    In May of 1998, LAMBERT decided to revamp the hospital. He decided to hire six new doctors, and grant them guaranteed salaries of between $165,000 and $350,000 per year, in addition to bonuses, paying of their student loans, paid offices and staff. Five of the six recruited doctors left the hospital at the end of one year, notwithstanding the lucrative and generous recruitment packages. In the year 2000 six new doctors were recruited by LAMBERT.

43.    Except for 2 physicians, the doctors hired by LAMBERT in 1998 and 2000, were Caucasian and none were of Filipino descent.

44.    In May of 2000, the hospital was burdened with a financial deficit of approximately two million dollars ($ 2,000,000.00).

45.    LAMBERT and other Defendants conspired to prevent protests regarding the mismanagement of the hospital.

46.    In furtherance of these goals, Defendants conspired to prevent the Plaintiff doctors from obtaining & treating patients, spread rumors that they were closing their practices, filed and caused to be filed false complaints, initiated repeated investigations into Plaintiff Doctors' medical practices, and referred patients only to the new doctors.

47.   Plaintiffs became increasingly frustrated with the mismanagement of the Hospital, and began speaking out. LAMBERT, through LANGLEY threatened to fire hospital employees who spoke to the Human Resources representative during office hours, and told board members they were prohibited from discussing things said in meetings. By the year 2000, the public learned the LANGLEY and LAMBERT had bought a magnetic Resonance Imaging Machine at a cost to the citizens of the county of $615,000.00. The machine was bought sought sight unseen. When it did arrive it was a non-working refurbished machine.

48.   The license to the Borger Rural Health Clinic, property of the Hospital District, was given to Defendant TIMMONS by selling it on paper for a negligible amount and then granting TIMMONS additional monies to cover the negligible amount allegedly paid by him. No other physicians were offered the same opportunity and the property of the District was sold secretly.

49.   CFO LANGLEY, under the control of LAMBERT, attempted to prevent dissemination of information and all protest. The Board was complicit in this maneuver.

50.   In February, 2000, LANGLEY tendered his resignation to the Hospital. He was paid severance equal to eight months of salary.

51.   The reason for his separation termination was maintained secret by LAMBERT in conspiracy with Hospital Attorney LEON MITCHELL.

52.   LAMBERT gave a sealed envelope to LaGRONE, and ordered her to keep it hidden and unsealed. The envelope was subsequently retrieved by LEON MITCHELL.

53.   Defendants HEADLEY, ZENI, RULLMAN, FRERIKS and RIBEIRO, (herein known as 'DEFENDANT BOARD MEMBERS') serve on the Hospital board.

54.   When LANGLEY was found to have obtained child pornography using the Hospital's computers, he arranged to have him given severance pay, did not report the matter to the police, and gave the evidence, sealed in an envelope, to LaGRONE with instructions to keep it. LAMBERT did so without disclosing to LaGRONE the contents of the envelope, and in concert with the Hospital Attorney MITCHELL. The circumstances of the terminated employee's termination were kept secret. It became public by accident when citizens of the county met with the District Attorney and the facts became known.

After FBI and the local authorities looked into the matter, LANGLEY was indicted on many federal felony charges.

55.   In 2001 when the members of the MEC learned of the events and the real reason LANGLEY left the hospital, they were outraged and published a notice in the local paper stating that no one had been informed that the matter under investigation was Child Pornography.

56.   Defendant BARD ROGERS responded through the newspapers that the members of the MEC were aware of the facts and were now getting around to raising it for personal gain. ROGERS published statements impugning the character of the members of the MEC were knowingly false.

57.   The specific factual allegations are more completely described below. All of the facts alleged in the Section titled "Causes of Action" are incorporated herein by reference, as though fully stated herein.

**CAUSES OF ACTION**

Plaintiffs incorporate all previous paragraphs as though fully stated herein in each subsection. The causes of action are as follows, and their factual basis include, but are not limited to the facts cited therein:

**I. DEFAMATION:** Defendants committed Common Law Defamation, Slander, Libel, and Business Disparagement in that:

A.   On or about June 5, 2001, Defendants HUERTAS, MANN, PERALES, PURL, RIBEIRO, ROGERS, TIMMONS, MAZA and YOUNIS sent a letter to the Hospital Board, in which they falsely accused the members of the MEC of conspiring to exclude new doctors, and of working contrary to the welfare of their patients. A summary of the letter was published in the Borger News Herald on or about June 8, 2001.

B.   On or about July 27, 2001, LAMBERT in concert with other Defendants caused an article to appear in the Borger News Herald with a headline reading

"Sangalang Guilty of Malpractice". However, jury found some negligence and no damages. The ruling was a take-nothing judgment.

C.    On or about September 4, 2001, Defendant O'KEEFE, an employee of Golden Plains Community Hospital, filed a complaint with the Texas Department of Health claiming that an individual whose name she did not know had accused Dr. STRECKER of being a "pervert". Ms. O'KEEFE also said that two (2) other women had reported similar incidents, but did not state the name of the other purportedly accusing women. She published this information orally to third parties. No disciplinary action was taken by the Department of Health after duly investigating the allegations.

D.    On or about September 12, 2001, Defendant LAMBERT, maliciously, told the Board of Directors of the Hospital that Dr. HOLLAND had committed acts which constituted abandonment of her patients on the previous weekend. However, HOLLAND had no patients at the Hospital on the weekend in question.

E.    On or about October of 2001, Defendant LAMBERT published defamatory statements accusing Plaintiff TRIROGOFF of refusing to treat a patient in an emergency, and of breaching a valid contract with the Hospital. These accusations were false. The incident referred to was not an emergency, and the contract referred to had expired over ten (10) years before.

F.    On or about January 17, 2002, shortly after previous fraudulent charges were dismissed by the Texas Department of Health, Defendant O'KEEFE induced another individual, or herself through a fictitious name, made a complaint of sexual impropriety against Dr. STRECKER.

G.    On or about November 9, 2001, Defendant HENDERSON published defamatory remarks regarding Plaintiff ELSTON, in that she told third persons he did not attend an ACLS course, which was required in order to keep his hospital privileges. These statements were wholly false and maliciously intended to revoke ELSTON'S privileges revoked and affect his practice.

H.  On or about 2001-2002, Defendant HENDERSON published false defamatory remarks regarding SANGALANG'S professional behavior, in that, she told Hospital Board Members, patients, and staff that;

1.  his actions were demeaning to the nurses staff;

2.  he grabbed a nurses name tag and threw it to the ground;

3.  failed to provide proper patient care.

These statements were wholly false and maliciously intended to subject SANGALANG to peer review and loss of privileges.

I.  On or about September 2001, HENDERSON and LAMBERT made defamatory statements regarding HOLLAND'S professional behavior in that they told the Hospital Board and staff, that HOLLAND abandoned patients for the weekend. These statements were wholly false and maliciously intended to subject HOLLAND to peer review before the hospital.

J.  On or about August 28, 2001, Defendant WHELCHEL, made defamatory statements to Ken Ingram, that LA GRONE had engaged in illegal activities and cost Golden Plains Community Hospital a substantial amount of money. These statements were wholly false and maliciously intended to subject LaGRONE to ridicule and contempt.

K.  Defendant WHELCHEL published defamatory comments against Plaintiff STRECKER, in that she told third persons, including HOLLAND, that STRECKER was using marijuana. These statements were wholly false and maliciously intended to subject STRECKER ridicule and contempt.

The defamatory statements made by Defendants were false. Defendants were motivated to make these statements by malice. They were not privileged to make any of these statements. The statements made would tend to injure their reputations, expose them to public hatred, contempt, ridicule, and financial injury, and impeach their honesty, integrity, virtue, and reputations. Plaintiff Doctors who were falsely accused of wrongdoing were damaged as a result, in that they lost income (patients left them), and time during which they could have been earning money (negating the false accusations). In addition, the involvement in this controversy

*Plaintiffs' First Amended Complaint*                                                  Page 9 of 21

has decreased their earning capacity.  Plaintiffs have also suffered emotional damage as a result
of Defendants' defamatory statements.

**II. INTERFERENCE WITH CONTRACTUAL RELATIONS:**  Defendants committed acts
of Interference with Prospective Business Relationships, Interference with Existing Contractual
Relations, and Conspiracy to Commit Tortious Interference in that:

A.     On or about October 29, 2001, Ms. Cora Moss brought her injured son to the
       Hospital. Ms. Moss became unhappy with the treatment her son was being given,
       and requested an ER hospital employee to contact Dr. SANGALANG. Ms.
       Moss's request was refused.  Such action was independently wrongful, as Dr.
       SANGALANG's agreement with the Hospital provided that he would be allowed
       to see his patients there.  Plaintiff suffered actual harm, in that the patient
       received a delay of treatment and was placed in jeopardy. This harm was the
       direct result of Defendants' actions.

B.     On or about August 15, 2002, Philip Bryson Smith was admitted to the hospital
       with a possible heart attack. His mother Barbara Smith asked the ER nurse to call
       Dr. SANGALANG. The hospital nurse told her that if her son was not a patient of
       Dr. SANGALANG he would not come to the hospital. After pleading, the nurse
       finally called Dr. SANGALANG and he arrived fifteen minutes after.

C.     On or about July 16, 2002, Defendant, WHELCHEL, sent a memo to the Medical
       Staff at the Hospital that Dr. HOLLAND'S patients were to be seen by the ED
       Physician while she was away. Dr. HOLLAND had directly requested that her
       patients be referred to Dr. Bhatia and Sampat.

D.     On or about 2001, the Hospital, at the direction of LAMBERT and the Board,
       began requiring that all doctors who performed services at the Hospital designate
       a person to provide patients with anesthesia.  They were asked to choose between
       Dr. TRIROGOFF, a medical doctor specializing in anesthesia, and Chuck Flinko,
       a Certified Registered Nurses Assistant employed by the Hospital, to provide
       them with anesthesia.  Henceforth, clients who required anesthetization were not
       given a choice of whether to use a doctor or a nurse for this delicate procedure.

The Defendant Doctors all chose Mr. Flinko rather than Dr. TRIROGOFF. These actions by Defendants, in conjunction with the hiring of nurse practitioners to be paid through the general revenue funds of the county, was meant to exclude Plaintiffs from exercising their privileges with the Hospital, and impacted patients who were neither advised of the benefits of having a Board Certified Anesthesiologist versus the services of a Nurse.

E.    The license to the Borger Rural Health Clinic, property of the Hospital District, was given to Defendant TIMMONS by selling it on paper for a negligible amount and then granting TIMMONS additional monies to cover the cost. In effect, giving TIMMONS his own private practice to remain an employee of the Hospital, and preventing Plaintiff physicians from the ability of purchasing or using those facilities.

**III. WRONGFUL DISCHARGE:** Plaintiff LaGRONE was employed by Defendant Hospital since January 7, 1997. In January, 2001 she became the Hospital's risk manager and compliance officer. In that capacity, she was charged with the duties of reviewing the Hospital's policies and actions, making sure they were in compliance with the law, reviewing any potential liability of the hospital, and advising it as to suggested actions to take. Every hospital, no matter how large or small, has a risk manager. It is common practice with many hospitals to have the risk manager/compliance officer report directly to the board in order to avoid any potential for conflict with those persons whose actions are being scrutinized. She was an exemplary employee during the entire time, earning many awards including the CEO award in 1998, the Good Attendance Award in 1998, 1999, 2000, and 2001, the Team Excellence Award in 1997, and the CTC Recognition Award in 1998.

LARRY LANGLEY was hired as the Hospital's CFO on or about May of 1997. On or about January 28, 2000 LANGLEY resigned, effective February 25, 2000. Defendant LAMBERT refused to answer the questions of the President of the Board as to why LANGLEY had resigned. LAMBERT approved LANGLEY's resignation, and awarded him severance pay in accordance with his contract. Shortly before this, the LAMBERT brought Plaintiff

LaGRONE a sealed envelope, with instructions to leave it sealed, but to keep it. It was placed in her safe. LaGRONE did as she was told.

On or about May 8, 2001, an article was published in the local newspaper exposing the reason for LANGLEY's resignation. Mitchell admitted to the District attorney that he had been complicit in secreting the evidence. In fact, Mitchell retrieved the envelope which held the evidence of criminal actions from the safe of LaGRONE. He concealed the evidence until confronted by the District Attorney and never turned it over to the authorities. Only then did LaGRONE realize that the envelope she had been given contained the child pornography LANGLEY had downloaded. On or about May 9, 2001, LaGRONE, very upset about this, contacted the Texas Nurses Association for advise concerning her duties and potential liability. She informed Melody Henderson, LAMBERT's assistant, and Chief Operation Officer, and the MEC about this, and of her intent to cooperate in any criminal investigation of the matter. On or about six days later, May 15, 2001, LaGRONE was told that the position of Quality/Risk Manager had been eliminated. On or about July 7, 2001, LANGLEY surrendered to the police.

A.  LaGRONE was terminated in retaliation for her speaking out and refusal to conceal the illegal acts of LAMBERT and MITCHELL. Also, her termination based on age discrimination.

B.  LaGRONE has completed the administrative process and timely filed a charge of Discrimination and retaliation with the EEC. More than 180 days have passed, and EEOC has issued its right to sue letter.

C.  LaGRONE was the victim of Lambert and his co-conspirators in furtherance of their illegal and wrongful actions. She was subjected to the same or similar malicious, slanderous and wrongful acts which were perpetrated against all parties who opposed, questioned or spoke out about the actions of Defendant Lambert and the Board of Directors. As a salaried employee, the first action taken to deprive LaGRONE of the ability acquire and/ or disseminate information about the on-going wrongful practices was to terminate her under the outrageous pretext that the hospital was doing away with the position of Risk/Manager and Chief Compliance Officer.

## IV. ABUSE OF PROCESS

The Hospital had a Peer Review process whereby unresolved cases and questionable circumstances of medical care may be reviewed by doctors other than the treating physician, in order to determine whether proper care was given. The process was arbitrarily changed in January 2002. This current review process may be initiated by the Board of Directors, the Chief Executive Officer (LAMBERT), or any physician at the hospital. All Defendants have utilized this process in order to harass Plaintiffs, suddenly commencing peer review of files that were either already reviewed, old or merit less.

From 2001-2002, HOLLAND has had four (4) files peer reviewed, Ed QUIROS had four (4) files reviewed, TRIROGOFF had two (2) files reviewed and SANGALANG has had seven (7) files reviewed. The matter in which a take-nothing judgment was rendered was reviewed twice, the first time after suit was filed, and the second time after judgment was rendered. Few of the Defendant doctors have had their files peer reviewed, despite multiple reported allegations of serious medical occurrences on their parts. Defendants have instructed staff to review all of Plaintiff Doctors' files, in order to attempt to find files in which any questionable practices took place. This harassment has been ongoing and the same instructions were not given for Defendant Doctors' files.

Defendants were motivated to commit the acts cited above by malice, a desire to injure the Plaintiffs involved, and to eliminate them as competition. The Plaintiffs involved were damaged as a result.

## V. CONSTITUTIONAL CLAIMS: §1983

A.   FREE SPEECH: By the actions of the following Defendants, Plaintiffs have been denied their right to free speech in addressing public concerns affecting the health and general welfare of the taxpayers of Hutchinson County. Defendants are all employees of the Hospital.

1.   On or about 2001, LAMBERT told STRECKER that he was not to discuss any matters discussed by the Hospital board, as it was illegal to do so. On February, 2002, STRECKER did raise the issue of confidentiality with District Attorney Clay Ballman who advised Dr. STRECKER that this

was in fact a lie as it was not illegal. As STRECKER became more vocal about the occurrences he observed and the criminal acts of LANGLEY became public, STRECKER was repeatedly reprimanded by members of the Hospital Board (which include DEFENDANT BOARD MEMBERS) and threatened with legal action by Hospital Attorney LEON MITCHELL.

2. Defendants constantly attempted to force Plaintiffs to cease their protests over the mismanagement in the Hospital, in that;

   a. On or about February 2, 2001, an interview with Defendant RIBEIRO appeared in the newspaper, in which RIBEIRO falsely stated that certain individuals or groups of individuals attempted to create turmoil for others, almost as if they secretly delighted in the misfortunes of others.

   b. On or about April 20, 2001, Defendant LAMBERT wrote an open letter, in which he stated that "certain individuals" (former Plaintiff members of the MEC) had become criminal in their efforts to discredit the administration and Dr. RIBEIRO. He stated that those persons had lied and falsified documents. He also made accusations of trespass.

   c. On or about May 9, 2001, Plaintiff LaGRONE informed LAMBERT's assistant, HENDERSON that she would cooperate with the criminal investigation of the criminal activities engaged in by the CFO Langley and the actions of Lambert and hospital attorney Mitchell in conspiring to conceal criminal evidence. LaGRONE was terminated within six days and her job duties assumed by HENDERSON. The Board, Lambert and Henderson all conspired to eliminate Ms. LaGRONE.

      Further, LaGRONE was provided information by LAMBERT which Defendant LAMBERT knew to be evidence of criminal activity and hospital improprieties. LAMBERT ordered LaGRONE to conceal the documents and never informed her of

the nature or contents of the material; thereby restricting her ability to communicate with the proper authorities, and denied her right of free speech.

B.    EQUAL PROTECTION: Plaintiffs SANGALANG, TRIROGOFF, ED QUIROS, and C.P. QUIROS (hereinafter "the Filipino Doctors") are of Filipino descent and over the age of fifty. Filipino Doctors assert Defendant LAMBERT and DEFENDANT BOARD MEMBERS violated their right to Equal Protection based on discrimination by race resulting in the loss of/or interference with tangible interests, privileges and property rights.

Defendant LAMBERT exhibited his dislike for persons of Filipino descent when he terminated Dr. Viola's employment and refused a Locum sent by the recruitment agency as he was Filipino. LAMBERT's reason for firing Viola was that Dr. Viola was not of their kind and/or did not fit in the community. Additionally, he expressed to the Hospital board that the Filipinos were greedy and worked under the table.

The Plaintiff Doctors have always had agreements with the Hospital to work as independent contractors, paid directly by patients, and only for work done. Majority of the Defendant Doctors are all Caucasian men, under the age of 40, hired as employees with guaranteed salaries of between $165,000 and $350,000 per year, in addition to bonuses, student loan pay-offs, paid offices, and staff. There was no rational basis for giving these exceedingly different agreements to the Plaintiffs and Defendants, in that before the new doctors were hired, there were barely enough patients to keep the Plaintiff Doctors busy. LAMBERT used taxpayers money to hire new doctors and "get rid of the Filipinos", a sentiment he stated to Hospital Employees, soon after taking over as CEO.

Defendant LAMBERT acted knowingly, and directly participated in violating the 'Filipino Doctors' rights be free of discrimination.

## VI. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS:    The following Defendants intentionally inflicted emotional distress upon Plaintiffs as heretofore set forth;

A.    Defendant O'KEEFE intentionally inflicted emotional distress upon STRECKER, in repeatedly causing to be made false and malicious allegations of improper patient care by STRECKER with the Texas Department of Health. The making of these statements was an extreme and outrageous act, which Ms. O'KEEFE knew or had reason to know would cause Dr. STRECKER extreme emotional distress. These statements did, in fact, cause him extreme emotional distress, resulting in physical ailment requiring the prescription of medication. STRECKER has also suffered monetary damages as a result.

B.    Defendant LAMBERT intentionally inflicted emotional distress upon Plaintiff Doctors in that he caused a memorandum to be written on or about March 19, 2001 in which it was stated that one or more female employees had complained of improper sexual conduct by one or more medical staff members.   The memorandum was purportedly addressed to all of the physicians, but was only distributed to Plaintiff Doctors without envelopes.   This action implied that Plaintiff Doctors were the persons against whom the complaint was filed, and this implication was made known to all of the staff at the Hospital. LAMBERT caused the memorandum to be written and distributed in this manner with the intent or knowledge that his actions would result in severe emotional distress on the parts of Plaintiff Doctors. His actions were extreme and outrageous.  As a result of this action of LAMBERT, Plaintiffs suffered damages, personally and professionally.

C.    HUERTAS, MANN, PERALES, PURL, RIBEIRO, ROGERS, TIMMONS, MAZA and YOUNIS publicly accused Plaintiff Doctors of committing intentional and self-serving acts to destroy the Hospital. Their extreme and outrageous conduct, with the intent or knowledge that their actions would result in severe emotional distress on the parts of Plaintiff Doctors, caused Plaintiffs to suffer damages, personally and professionally.

D.    HENDERSON intentionally, and with the intent or knowledge that her actions would result in sever emotional distress to SANGALANG, made up false accusations to destroy SANGALANG'S reputation with his patients and medical

staff. These comments were extreme and outrageous and Plaintiff suffered damages, personally and professionally.

E.    WHELCHEL intentionally caused emotional distress in making allegations that LaGRONE had committed criminal acts. These comments were false, extreme, and outrageous, and done with the intent or knowledge that they would cause LaGRONE severe emotional distress. Plaintiff suffered ridicule, contempt, and damages, personally and professionally, as a result.

F.    Defendant WHELCHEL'S comments to third persons that STRECKER, was using marijuana, were extreme and outrageous and maliciously stated to knowingly cause Plaintiff severe emotional distress. As a result, Plaintiff was subject to ridicule, contempt, and suffered damages, personally and professionally.

G.    All Defendants have caused intentional infliction of emotional distress in their abuse of the peer review process set forth by the Hospital. Defendants' actions were extreme and outrageous and maliciously made in furtherance of their attempt to "get rid" of the Plaintiff Doctors. As a result, Plaintiffs have suffered damages, personally and professionally.

H.    Defendant LAMBERT, maliciously, told the Board of Directors of the Hospital that Dr. HOLLAND had committed acts which constituted abandonment of her patients. LAMBERT'S actions were done maliciously, and with the intent or knowledge that HOLLAND would suffer severe emotional distress, as a result. HOLLAND suffered damages, professionally and personally.

I.    LAMBERT and the DEFENDANT BOARD MEMBERS, committed extreme and outrageous conduct in changing Hospital policy to require all doctors who performed services at the Hospital designate a person to provide patients with anesthesia. Their actions were done with the malicious intent to "getting rid" of TRIROGOFF and with knowledge that their actions would cause TRIROGOFF severe emotional distress. As a result, TRIROGOFF suffered damages, professionally and personally.

J.      Plaintiffs also incorporate other actions taken by Defendants as asserted throughout this Original Complaint.

## VII. ANTITRUST: SHERMAN ACT

Plaintiffs incorporate all of the foregoing allegations and facts as though fully stated herein. The Hospital is the only hospital in Borger, Texas. The higher (tertiary) next closest hospital is in Amarillo, which is 50 miles away. Though when the Hospital has suffered from a poor reputation many Borger residents chose to go to other hospitals when possible, this has resulted in high risk to patients. There is no practical alternative to treatment in the Hospital, especially in urgent situations.

All Defendants salaries are financially supported by the Taxpayer's of Hutchinson County, while Plaintiff Doctors are not. LAMBERT and the Board consciously conspired to hire new doctors to get rid of the 'Plaintiff Doctors' and create a situation where it is in the Hospital's best interest to discourage patients from utilizing the services of Plaintiff Doctors, in that:

A.      Under the direction of LAMBERT and the DEFENDANT BOARD MEMBERS, the hospital began requiring all doctors who performed service at the Hospital to designate a person to provide anesthesia to patients. Taking the decision away from the patients and leaving it up to the doctors employed by LAMBERT and DEFENDANT BOARD MEMBERS.

B.      Defendants LAMBERT and DEFENDANT BOARD MEMBERS created an incentive with Defendant Doctors (hired by the Hospital) to prevent patients from utilizing the services of Plaintiff Doctors, in that their long-term financial stability would be increased or cemented and enhanced from the lack of any competition.

C.      Employees schemed to refer Plaintiffs patients to other Physicians (examples):

1.      On or about October 29, 2001, Ms. Cora Moss, brought her injured son to the Hospital and requested an Hospital employee to contact Plaintiff SANGALANG. The request was refused, causing the patient actual harm in the delay of his treatment.

2.    On or about August 15, 2002, Philip Bryson Smith was admitted to the hospital with a possible heart attack. His mother Barbara Smith asked the ER nurse to call Dr. SANGALANG. The hospital nurse told her that if her son was not a patient of Dr. SANGALANG he would not come to the hospital. After pleading, the nurse finally called Dr. SANGALANG and he arrived fifteen minutes later.

3.    On or about July 16, 2002 Defendant, WHELCHEL, sent a memo to the Medical Staff at the Hospital that Dr. HOLLAND'S patients were to be seen by the ED Physician while she was away. Dr. HOLLAND had directly requested that her patients be referred to Dr. Bhatia and Sampat.

4.    Defendants falsified records and complaints to subject Plaintiff Doctors to peer review.

D.    Defendants LAMBERT, HUERTAS, PERALES, TIMMONS, MANN, RIBEIRO, YOUNIS, MAZA, ROGERS, PURL, HEADLEY, ZENI, RULLMAN, and FRERIKS violated the Sherman Act, 15 U.S.C. §1 et seq, committing antitrust violations. They acted in a common scheme to benefit themselves and restrain trade by attempting to exclude Plaintiff Doctors from practicing at the Hospital. Their actions were a concerted effort to take business from Plaintiffs, in the hopes of forcing Plaintiff Doctors to close their practices, which resulted in an unreasonable restraint on trade, in that the residents of Borger, Hutchinson County, Texas and surrounding counties were neither informed or allowed to make a choice as to their medical providers. These actions were not legitimate. There were barely enough patients to keep the Plaintiffs Doctors busy before the hiring of new Doctors by LAMBERT. The actions had anticompetitive effects, or, alternatively, this practice should be prohibited as imposing an unreasonable restraint on competition. Plaintiff Doctors have been severely damaged as a result, as they have lost much of their income.

**VIII. CONSPIRACY TO MONOPOLIZE:**    Plaintiffs incorporate all of the foregoing allegations and facts as though fully stated herein. Defendants intended to monopolize all of the

medical care business in Borger, Texas. They wanted to prevent any other doctor, including and especially the Plaintiff Doctors, from practicing in Borger, Texas. Defendants worked in combination to perform the acts listed above in a conspiracy to achieve that objective. There was a substantial effect on interstate commerce, as Defendant Doctors were given contracts financial incentives and rewards by LAMBERT, and the Board, paid for by general revenue. If forced to leave Borger, Texas, the Plaintiff Doctors may be forced to leave the State of Texas.

## ATTORNEY'S FEES

It was necessary for Plaintiffs to secure the services of Alicia A. Wilde and Bill Cornet, licensed attorneys, to prepare and prosecute this suit. For services rendered, judgment for attorney's fees and expenses though final judgment after appeal should be granted against Defendants and in favor of Plaintiffs for the use and benefit of Plaintiffs' attorneys; or, in the alternative, Plaintiffs request that reasonable attorney's fees and expenses through final judgment after appeal be taxed as costs and be ordered paid directly to Plaintiffs' attorneys, who may enforce the order for fees in the attorney's own name

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that Defendants be cited to appear and answer herein; and that upon final hearing hereof, Plaintiffs have judgment against Defendants as for the following:

A.   Plaintiffs' actual damages for lost past income;

B.   Plaintiffs' expected future income;

C.   Plaintiffs' damages for emotional distress;

D.   Plaintiffs damages for other actual damages;

E.   Exemplary damages;

F.   Reasonable attorney fees;

G.   Injunctive relief;

H.   Post-judgment interest and costs; and

*Plaintiffs' First Amended Complaint*                                                         Page 20 of 21

I.      Such other and further relief to which Plaintiff may be justly enriched.

Respectfully Submitted,
LAW OFFICES OF ALICIA A. WILDE. P.C.
4113 Marathon Boulevard
Austin, Texas 78756
(512) 302-0400 Telephone
(512) 302-0439 Facsimile

By: _____
        Alicia A. Wilde
        SBN 01133050

CORNET LAW FIRM, P.L.L.C.
612 S. Van Buren
Amarillo, Texas  79101
(806) 374-9498 Telephone
(806) 374-2037 Facsimile

By: _____
        Bill Cornet
        SBN: 04835200

## AMENDED CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of September, 2002, a true and correct copy of the foregoing Plaintiff's Motion For Leave to Amend Pleadings, its Proposed Order, and Plaintiffs' First Amended Complaint was served upon the following:

Matthew Hand (via Fed-Ex)
Brown & Fortunato, P.C.
905 S. Fillmore, Suite 400
Amarillo, Texas 78105


Thomas C. Riney (via Fed-Ex)
Gibson, Ochsner & Adkins, LLP
Amarillo, Texas 79101-2400

and on 18th of September, 2002 a true and correct copy of the foregoing Plaintiff's Motion For Leave to Amend Pleadings, its Proposed Order, and Plaintiffs' First Amended Complaint was served upon the following:

Bill Cornet (via Regular Mail)
Cornet Law Firm, P.L.L.C.
612 S. Van Buren
Amarillo, Texas 79101

C. Dean Davis & Mark A. Keene (via CM/RRR)
Davis & Davis, P.C.
9442 Capital Plaza I, Suite 950
Austin, Texas 78759

Leon Mitchell (CM/RRR)
Gurley, Mitchell, Gassaway & Jones, LLP
P.O. Drawer 707
Borger, Texas  79008

Alicia A. Wilde