

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| DR. GERRY HOLLAND, DO, et al., | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 2-02CV-0157J |
| MR. NORMAN LAMBERT, as | § | |
| CEO of Golden Plains Community | § | |
| Hospital and Individually, et al., | § | |
| | § | |
| Defendants | § | |

**BRIEF IN SUPPORT OF DEFENDANT NORM LAMBERT'S MOTION FOR
SUMMARY JUDGMENT**

Craig Carter
State Bar No. 03908100
DAVIS & DAVIS, P.C.
C. Dean Davis, TBN 05464000
Mark A. Keene, TBN 00784375
9442 Capital of Texas Highway
Austin, Texas  78759
(512) 343-6248; 343-0121 FAX

ATTORNEYS FOR DEFENDANTS
LAMBERT, O'KEEFE, HEADLEY, RIBEIRO,
FRERIKS, ZENI, WHEELER, RULLMAN,
HENDERSON, AND WHELCHEL

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ iii, iv, v, vi, vii, viii

BRIEF IN SUPPORT OF DEFENDANT NORM LAMBERT'S MOTION FOR SUMMARY JUDGMENT .................................................................................................................1

I. INTRODUCTION ......................................................................................................1

II. SUMMARY JUDGMENT EVIDENCE.....................................................................1

III. FACTS .......................................................................................................................2

IV. ARGUMENT..............................................................................................................5

Federal Law Claims .........................................................................................................5

A. CLAIMS BROUGHT UNDER 42 U.S.C. § 1983...................................................5

    1. FIRST AMENDMENT CLAIMS.......................................................................7

*Strecker's claims* ............................................................................................................8

*LaGrone's dismissal claim* ...........................................................................................10

*Additional First Amendment allegations* .....................................................................19

    2. EQUAL PROTECTION CLAIMS ...................................................................20

    3. OFFICIAL CAPACITY CLAIMS ...................................................................26

B. ANTITRUST CLAIMS .........................................................................................27

C. LAGRONE'S EMPLOYMENT DISCRIMINATION CLAIM ...............................30

*State Law Claims* ...........................................................................................................33

D. OFFICIAL IMMUNITY........................................................................................33

E. DEFAMATION/BUSINESS DISPARAGEMENT.................................................34

F. INTERFERENCE WITH CONTRACT..................................................................38

G. LAGRONE'S STATE LAW WRONGFUL TERMINATION CLAIM ..................42

H. ABUSE OF PROCESS ..........................................................................................43

I. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ..............................................44

J. OFFICIAL CAPACITY CLAIMS...........................................................................................46

K. PEER REVIEW/MEDICAL COMMITTEE IMMUNITIES ...................................................47

CERTIFICATE OF SERVICE ....................................................................................................49

TABLE OF AUTHORITIES

## Cases

*Anderson v. Creighton,*
     483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) ........................... 6

*Anderson v. Pasadena Independent School District,*
     184 F.3d 439, 444 (5th Cir. 1999). ........................................................... 12

*Am. Med. Int'l, Inc. v Giurintano,*
     821 S.W.2d 331, 335 (Tex. App.—Houston [14th Dist.] 1991, no writ). ....................... 39

*Bagg v. University of Texas Medical Branch,*
     726 S.W.2d 582, 584, Tex.App.-Houston [14th District] 1987, writ refused n.r.e.) 46

*Barkoo v. Melby,*
     901 F.2d 613 (7th Cir. 1990) .................................................................... 11

*Benningfield v. City of Houston,*
     157 F.3d 369, 376 (5th Cir. 1998) ........................................................... 8, 9

*Bossin v. Towber,*
     894 S.W.2d 25, 33 (Tex. App.—Houston [14th Dist.] 1994, writ denied)
     (emphasis added) ................................................................................ 43

*Breaux v. City of Garland,*
     205 F.3d 150, 156 (5th Cir. 2000) ................................................... 7, 8, 12, 13

*Brown v. Lyford,*
     243 F3d 185, 189, 190 (5th Cir. 2001) ....................................................... 6

*Cain v. Hearst Corp.,*
     878 S.W.2d 577, 580 (Tex. 1994) ............................................................. 35

*Cantu v. Rocha,*
     77 F.3d 795, 808 (5th Cir. 1996)) ............................................................ 33

*City of Lancaster v. Chambers,*
     883 S.W.3d 650, 656-657 (Tex. 1994)) ....................................................... 33

*Colson v. Grohman,*
     174 F.3d 498, 511 (5th Cir. 1999) ........................................................... 8, 9

*Connick v. Myers,*
    461 U.S. 138, 147-148, 103 S. Ct. 1684, 75 L.Ed.2d 708 (1983) ...................................12

*Dambrot v. Central Mich. Univ.,*
    55 F.3d 1177, 1186 (6th Cir. 1995)...........................................................................7

*DBI Services, Inc. v. Amerada Hess,*
    Corp., 907 F.2d 506-08 (5th Cir. 1990) .........................................................41

*Ellis v. Weasler Engineering Inc.,*
    258 F.3d 326, 336-337 (5th Cir.) ...............................................................34

*Exxon Corp. v. Burglin,*
    42 F.3d 948, 950 (5th Cir. 1995) ..............................................................33

*Fogarty v. Boles,*
    121 F.3d 886, 890 (3d Cir. 1997)..............................................................11

*Gonzales v. Dallas County Texas,*
    249 F. 3d 406, 412, n. 6 (5th Cir. 2001) .....................................................15

*Graham v. Mary Kay Inc.,*
    25 S.W.3d 749, 756 (Tex. App.-Houston [14th Dist.] 2000, pet. denied)........................43

*Halbert v. City of Sherman,*
33 F.3d 526, 529 (5th Cir. 1994) ................................................................35

*Harlow v. Fitzgerald,*
    457 U.S. 800,807, 102 S.Ct. 2727,2732 (1982) ...........................................6

*Harrington v. Harris,*
    118 F.3d 359, 366 (5th Cir. 1997) ............................................................8

*Hill v. Heritage Resources, Inc.,*
    964 S.W.2d 89, (Tex. App.—El Paso, 1997, pet. rev. denied) .........................................40

*Johnson v. Rodriguez,*
    110 F.3d 299, 306 (5th Cir. 1997) ..............................................................22

*Jones v. Collins,*
132 F.3d 1048, 1053 (5th Cir. 1998) ...........................................................11

*Julian v. City of Houston, Tex.,*
    314 F.3d 721, 725-26 (5th Cir. 2002) ...........................................................31

*Kipps v. Callier,*
197 F.3d 765, 768 (5th Cir. 1999) .............................................................6

*Kiser v. Garrett,*
    67 F.3d 1166, 1173 (5th Cir. 1995) ............................................6

*Leffall v. Dallas Indep. Sch. Dist.,*
    28 F.3d 521, 525 (5th Cir. 1994) .............................................5

*Nordlinger v. Hahn,*
    505 U.S. 1, 10 (1992) ......................................................23

*Martin v. Stites,*
    31 F.Supp.2d 926, 930 .....................................................27

*Midland Judicial District Community Supervision and Corrections Department v. Jones,*
    92 S.W.3d 486, 487 (2002) ...........................................27, 42

*Monell v. New York Dept. Soc. Serv.,*
    436 U.S. 658, 694, 98 S.Ct. 2018 (1989) .................................26

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,*
    429 U.S. 274, 287, 97 S. Ct. 568, 576, 50 L. Ed. 2d 471 (1977) .........7, 14, 15

*Personnel Amin'r of Mass. v. Feeney,*
    442 U.S. 256, 279 (1979) ..................................................22

*Pierce v. Texas Dept. of Criminal Justice Institutional Div.,*
    37 F.3d 1146, 1150 (5th Cir. 1994)) ........................................8

*Piotrowski v. City of Houston,*
    237 F. 3d 567, 578 (5th Cir. 2001) ......................................26

*Price v. Federal Express Corp.,*
    283 F.3d 715, 720 (5th Cir. 2002) .......................................31

*Prudential Ins. Co. v. Financial Review Servs.,*
    29 S.W.3d 74, 77-78 (Tex. 2000) ..........................................39

*Rhodes v. City of Plano,*
    991 S.W.2d 479, 481 (Tex. App.—Fort Worth, 1999, no writ) .............43

*Sabine Pilot Sevice, Inc. v. Hauk,*
    687 S.W2d 733 (Tex. 1985) ...........................................38, 42

*Sandcrest Outpatient Services v. Cumberland County Hospital System,*
853 F.2d 1139, 1145, n. 7 ......................................................................................28

*Shaboon v. Duncan,*
252 F.3d 722, 729 (5th Cir. 2001) ..........................................................................33

*Slack v. Carpenter,*
7 F.3d 418 (5th Cir. 1993) .......................................................................................19

*Stults v. Conoco, Inc.,*
76 F.3d 651, 655 (5th Cir. 1996) ............................................................................30

*Tamez v. City of San Marcos,*
118 F.3d 1085, 1097 (5th Cir. 1997) ......................................................................33

*Tandy Corp. v. McGregor,*
527 S.W.2d 246, 249 (Tex. Civ. App.—Texarkana 1975, ref. n.r.e.)(emphasis added) ..43

*Taxey v. Maricopa County,*
237 F.Supp.2d 1109, 1113 (D. Arizona, 2002) ......................................................31

*Telthorster v. Tennell,*
92 S.W.3d 457, 461 (Tex. 2002) .............................................................................33

*Thatcher Enterprises v. Cache County Corporation,*
902 F.2d 1472, 1477-78 (10th Cir. 1990) .........................................................28, 30

*Thomas v. Texas Department of Criminal Justice,*
220 F.3d 389, 395 (5th Cir. 2000) ..........................................................................30

*Threlkeld v. Total Petroleum, Inc.,*
211 F.3d 887, 891 (5th Cir. 2000) ..........................................................................34

*Turner v. Houma Mun. Fire and Police Civil Service Bd.,*
229 F.3d 478, 483 (5th Cir. 2000) ..........................................................................26

*Twyman v. Twyman,*
855 S.W.2d 619, 621 (Tex. 1993)............................................................................44

*University of Texas Medical Branch v. York,*
871 S.W.2d 175, 179 (Tex.1994) .......................................................................46, 47

*Wal-Mart Stores, Inc. v. Sturges,*
52 S.W.3d 711, 723-26 (Tex. 2001) ........................................................................39

*Washington v. Davis,*
    426 U.S. 229, 238-42, 96 S.Ct. 2040, 2046-49, 48 L.Ed.2d 597 (1976) ...................21, 22

*Washington v. Department of Transp.,*
    8 F.3d 296, 300 (5th Cir. 1993) ...................................................................................33

*WFAA-TV, Inc. v. McLemore,*
    978 S.W.2d 568, 571 (Tex. 1998) .............................................................................35

*W.G. Pettigrew Distrib. Co. v. Borden, Inc.,*
    976 F. Supp. 1043, 1059 (S.D. Tex. 1996), *aff'd,* 127 F.3d 34 (5th Cir. 1997) ...............35

*Williams v. Bramer,*
    180 F.3d 699, 703 (5th Cir. 1999) ...............................................................................6

*Williams v. Kentucky,*
    24 F.3d 1526, 1534 (6th Cir. 1994) ..............................................................................8

*Wren v. Towe,*
    130 F.3d 1154, 1160 (5th Cir. 1997) ...........................................................................33

*Vera v. Tue,*
    73 F.3d 604, 609 (5th Cir. 1996) ...............................................................................22

*Yates v. Stalder,*
    217 F.3d 332, 334 (5th Cir. 2000) ...............................................................................23

*Young v. City of Houston,*
    906 F.2d 177, 179 (5th Cir. 1990) ...............................................................................31

## Codes

42 U.S.C. § 1983 ................................................................................................3, 5, 7

15 U.S.C. §§ 1 and 2 ...............................................................................................30

5 U.S.C. §35(a) ..................................................................................................27, 28

Texas Occ. Code §161.001 et seq ...............................................................................47

Tex. Occ. Code §160.010(a)-(c) ...............................................................................47

42 U.S.C. §§11101, et seq ........................................................................................47

Texas Gov't Code §554.00 ...........................................................................................43

Tex. Civ. Prac. & Rem. Code §16.003 .......................................................................19

Tex. C.P.R.C. §101.021 ...............................................................................................47

**Rules**

29 C.F.R. §1601.12(b) ................................................................................................31

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| DR. GERRY HOLLAND, DO, et al., | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 2-02CV-0157J |
| MR. NORMAN LAMBERT, as | § | |
| CEO of Golden Plains Community | § | |
| Hospital and Individually, et al., | § | |
| | § | |
| Defendants | § | |

### BRIEF IN SUPPORT OF DEFENDANT NORM LAMBERT'S MOTION FOR SUMMARY JUDGMENT

TO HONORABLE UNITED STATES DISTRICT COURT:

Defendant Norman Lambert, as CEO of Golden Plains Community Hospital and Individually ("Lambert"), submits this brief in support of his Motion for Summary Judgment.

## I. Introduction

Defendant Lambert, as part of the Hospital Defendants, previously filed Motions to Dismiss. On February 21, 2003, the Court issued an order advising that the Motions to Dismiss were to be treated as Motions for Summary Judgment, and that supporting evidence should be filed with the Court by March 24, 2003. With this Motion, Defendant Lambert shows that he is entitled to summary judgment as a matter of law.

## II. Summary Judgment Evidence

Defendant Lambert relies upon the evidence contained in the Appendix ("App.") to Hospital Defendant's Motions for Summary Judgment, which is hereby incorporated by reference.

### III. Facts

Because of the numerous claims asserted in Plaintiffs' First Amended Complaint ("Complaint"), most of the facts specific to Plaintiffs' claims are referenced in the body of this brief. The following facts provide general background information:

1.      Plaintiffs consist of six medical doctors who hold privileges at Golden Plains Community Hospital ("GPCH") in Borger, Gerry Holland, Romeo Sangalang, Steve Elston, Gloria Trirogoff, Ed Quiros and C. P. Quiros, and two additional Plaintiffs, Jerry Stecker and Cynthia LaGrone. *See* Plaintiff's First Amended Complaint ("Complaint"), p. 4.

2.      Strecker is a Marriage and Family Therapist whose main complaint in this suit is that Defendant O'Keefe filed a complaint with the Texas Department of Health based on information given to her by his former patients. *Id.* at p. 8.

3.      LaGrone is the former risk manager/quality assurance officer at GPCH. Her employment at GPCH ended in May 2001 when her position was eliminated by the Hospital CEO Norm Lambert. Affidavit of Lambert (App. 676, para. 18).

4.      Plaintiff Physicians were recruited to the Hospital between 1977 and 1994 and they hold private practices in Borger, Texas. *See* Complaint, p. 4. Thus, at the time of the events complained about in this suit, Plaintiff Physicians were established physicians in Borger.

5.      Plaintiffs Holland and Strecker are former Board members who served on the Hospital Board when many of the events of which they complain in this suit occurred. Holland Depo., p. 20, lines 6-12 (App. 5); Strecker Depo., p. 104, line 19-24; p. 188, line 11 – p. 189, line 5 (App. 386). Although Plaintiffs complain about the Defendant Physicians' recruitment agreements at GPCH, the Board approved these agreements while Strecker and Holland were

board members, and neither of them voted against any of the agreements. Complaint, pp. 5, 15; Affidavit of Lambert (App. 673, para 7).

6.      Defendants consist of the following: Headley, Freriks, Zeni, Wheeler, Rullman and Ribeiro are current or former members of the Hutchinson County Hospital District Board of Directors. See Complaint. At GPCH, Lambert is the CEO, Henderson is Chief Operating Officer and Chief Nursing Officer, Whelchel is medical staff secretary, and O'Keefe is a social worker at GPCH. Affidavit of Lambert (App. 671, para.1); Affidavit of Melody Henderson (App. 812); Affidavit of Kathy Whelchel (App. 831); Affidavit of Kathy O'Keefe (App. 833). The remaining Defendants are physicians, who are members of the medical staff at GPCH. Eight of the nine physicians were recruited to GPCH in 1999-2000. Affidavit of Lambert (App. 673, para. 7).

7.      GPCH is part of the Hutchinson County Hospital District ("Hospital District"), which is a governmental entity created by the Texas Legislature in 1989. Id. (App. ).

8.      Defendant Board Members serve as volunteers for the Hospital District's Board of Directors. Id, Attachment 1 (App 694, para.8.2).

9.      Plaintiffs attempt to allege claims under 42 U.S.C. § 1983 (First Amendment and Equal Protection), antitrust violations, and employment discrimination claims, as well as state law causes of action for defamation, interference with contractual relations, wrongful discharge, abuse of process, and intentional infliction of emotional distress. See Complaint.[1]

---

[1] Hospital Defendants still have a Motion to Sever on file and would ask the Court to consider the Motion if all claims are not dismissed on summary judgment.

10.     None of the Plaintiff Physicians have had their privileges at GPCH revoked. [2] *See* Holland Depo., p. 168, lines 9-21 (App. 42); C. P. Quiros Depo., p. 117, lines 12-16 (App. 561); Ed Quiros Depo., p. 86, lines 6-14 (App. 438); Elston Depo., p. 75, lines 6-11 (App. 315); Trirogoff Depo., p. 107, line 24 – p. 108, line 7 (App. 189); Sangalang Depo., p. 215, line 19 – p. 216, line 2 (App. 129).

11.     Four of the Plaintiff Physicians *voluntarily* changed their privileges at GPCH from "active" to "courtesy" on December 3, 2001, and all of the Plaintiff Physicians are currently on the GPCH medical staff and hold some type of privileges.  *See* Sangalang Depo., p. 12, line 24 – p. 13, line 23 (App. 78-79); Holland Depo., p. 61, line 13 – p. 62, line 10 (App. 16); Trirogoff Depo., p. 88, line 15 – p. 89, line 15 (App. 184-185); Elston Depo., p. 69, line 18 – p. 72, line 17 (App. 314).

12.     LaGrone alleges her employment was terminated in retaliation for exercising free speech rights and based on age discrimination.  Complaint, p. 12.

13.     LaGrone did not file a Charge of Discrimination alleging age discrimination within 300 days of her employment ending at GPCH.  (App. 396-398).

14.     LaGrone alleges that she engaged in protected speech on May 9, 2001, which resulted in her being terminated on May 15, 2001.  Complaint, p. 14.

15.     LaGrone alleges that on May 9, 2001, she informed Melody Henderson of her intent to cooperate in any criminal investigation regarding possession of child pornography materials by the former Chief Financial Officer, Larry Langley,.  Complaint, p. 14

---

[2] Sangalang is currently on a 90-day extension of his courtesy privileges at GPCH while the Medical Executive Committee considers whether to approve or deny his application to renew privileges. *See* Lambert Affidavit (App. ).

16.     LaGrone never participated in a criminal investigation regarding the Langley child pornography matter.  Deposition of LaGrone, p. 133, line 18 – p. 134, line 2 (App. 259).

17.     LaGrone has no evidence that Lambert was ever made aware of her alleged "protected" speech prior to his decision to eliminate her position on May 15, 2000.  Deposition of Cynthia LaGrone, p. 132, line 9 (App. 258) - p. 133, line 7 (App. 259).

18.     LaGrone received negative evaluations from Lambert in 1997, 1999 and 2001 and he considered terminating her employment in 1997.  Affidavit of Lambert (App. 675, para. 14, 15, Attachment 5 (App. 771-797).

19.     Prior to deciding to eliminate her position, Lambert had received complaints from a number of employees regarding LaGrone's conduct.  Affidavit of Lambert (App. 676, para. 16; Affidavits of Veronica Espinoza, Teresa Brown, Kimberly Lopez, Kelly McDonald (App. 835-843).

20.     One additional factor in Lambert's decision to eliminate LaGrone's position in May 2001 was that the composition of the Hospital Board changed that month and Lambert believed that he would receive more support from the newly composed Board regarding his administrative decisions.  Affidavit of Lambert (App. 676, para. 19).

## IV. ARGUMENT

*Federal Law Claims*

**A.**     CLAIMS BROUGHT UNDER 42 U.S.C. § 1983

Various Plaintiffs have brought claims under Section 1983 against Defendant Norm Lambert, alleging violations of the First Amendment and the Equal Protection clause.  In order to prevail on a Section 1983 claim, Plaintiffs must (1) prove a violation of rights secured by the Constitution or laws of the United States and (2) demonstrate that a person acting under color of

state law committed the alleged deprivation. *Leffall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521, 525 (5th Cir. 1994). As a public official, Lambert is entitled to qualified immunity from suit and from damages in a §1983 action against him in his individual capacity unless it is shown that he violated clearly established law and that his conduct was not objectively reasonable. *Harlow v. Fitzgerald*, 457 U.S. 800,807, 102 S.Ct. 2727,2732 (1982); *Kiser v. Garrett*, 67 F.3d 1166, 1173 (5th Cir. 1995). It is the Plaintiffs' burden to establish that qualified immunity does not shield Lambert from suit and liability in this case. To overcome his entitlement to qualified immunity, Plaintiffs must show 1) a constitutional violation; 2) of a right clearly established at the time the violation occurred; and 3) that Lambert actually engaged in conduct that violated the clearly established right. *Brown v. Lyford*, 243 F3d 185, 189 (5th Cir. 2001). Clearly established means that, in the light of pre-existing law, the unlawfulness of the defendant's action must be "apparent." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). After this analysis, if the Court determines that Lambert's actions were unconstitutional, it must inquire whether his actions were "objectively reasonable." *Kipps v. Callier*, 197 F.3d 765, 768 (5th Cir. 1999). "Objective reasonableness is a matter of law for the courts to decide, not a matter for the jury." *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999). Ultimately, Plaintiffs "must clear a significant hurdle to defeat qualified immunity." Lambert's conduct in this case must not even be "arguably" lawful for his immunity to be lost. *Brown v. Lyford*, at 190.

Thus Plaintiffs' §1983 claims must be analyzed to determine not only whether they have sufficient evidence to establish the essential elements of each claim, but also whether Plaintiffs have sufficient evidence to overcome Lambert's entitlement to qualified immunity.

1.    FIRST AMENDMENT CLAIMS

Plaintiffs are asserting the following First Amendment violations under 42 U.S.C. § 1983 against Lambert: (1) Lambert told Plaintiff Strecker that he was not to discuss matters discussed by the Hospital board and Plaintiff Strecker was repeatedly reprimanded and threatened with legal action when he become more vocal about Larry Langley, former CFO of the Hospital; (2) Lambert wrote a letter in which he stated that "certain individuals" had become criminal in their efforts to discredit the administration and Ribeiro, and "those persons" had lied and falsified documents; he also made allegations of trespass; (3) Lambert "conspired to eliminate" Cynthia LaGrone after she had informed Melody Henderson "that she would cooperate with the criminal investigation of the criminal activities engaged in by the CFO Langley and the actions of Lambert and hospital attorney Mitchell in conspiring to conceal criminal evidence"; and, (4) Lambert provided LaGrone with information that he knew to be evidence of criminal activity and hospital improprieties, ordered her to conceal the documents and never informed her of the nature or contents of the material. Plaintiffs' First Amended Complaint, pp. 14-15.

To establish a Section 1983 retaliation claim for violation of First Amendment rights, Plaintiffs must allege and prove that: (1) the plaintiff suffered an adverse action; (2) the plaintiff's speech involved a matter of public concern; (3) the interest in commenting on matters of public concern outweighs the defendant's interest in promoting efficiency; and (4) the plaintiff's speech motivated the defendant's action. *Breaux v. City of Garland*, 205 F.3d 150, 156 (5th Cir. 2000). A plaintiff must show that the speech was protected by the Constitution and that the speech was a substantial or motivating factor in the adverse action. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S. Ct. 568, 576, 50 L. Ed. 2d 471 (1977);

*Dambrot v. Central Mich. Univ.*, 55 F.3d 1177, 1186 (6th Cir. 1995). The inquiry regarding whether speech addresses a matter of public concern is a question of law. *See Williams v. Kentucky*, 24 F.3d 1526, 1534 (6th Cir. 1994).

*Strecker's claims*

The allegations regarding Plaintiff Strecker do not state a constitutional violation because they do not involve adverse action taken against Strecker as necessary to state a First Amendment claim. "Some things are not actionable even though they have the effect of chilling the exercise of free speech." *Benningfield v. City of Houston*, 157 F.3d 369, 376 (5th Cir. 1998) (*citing Pierce v. Texas Dept. of Criminal Justice Institutional Div.*, 37 F.3d 1146, 1150 (5th Cir. 1994)). The Fifth Circuit has specifically held that the following are not adverse actions which are sufficient to support a claim of First Amendment retaliation:

1) accusations or criticism, *see Harrington v. Harris*, 118 F.3d 359, 366 (5th Cir. 1997);
2) oral threats or abusive remarks, *see Breaux v. City of Garland*, 205 F.3d 150, 158 (5th Cir. 2000);
3) investigations, *see Pierce*, 37 F.3d at 1150;
4) false accusations, *see Colson v. Grohman*, 174 F.3d 498, 511 (5th Cir. 1999);
5) verbal reprimands, *see Benningfield*, 157 F.3d at 377; and
6) written reprimands that are later rescinded, *see Benningfield*, 157 F.3d at 377.

Strecker's allegation that he was told not to discuss matters discussed by the Hospital board do not state a First Amendment claim because it does not state any retaliation or adverse action taken against Strecker. Strecker's allegations concerning reprimands also do not state a First Amendment claim. In his deposition, Strecker testified that he received the following "reprimands": i) he was told not to act as an individual board member by Norm Lambert and Mark Headley; ii) when he tried to get financial records between the Hospital and the Borger News Herald, he was told by Lambert that he was trying to get into information that belonged to

Lambert, that Strecker had no right to it, and that it was interfering with Lambert doing his job and taking time away from employees to do other needed work; iii) some of the motions made by Strecker as a Board Member were not seconded by the other members of the Board; iv) when Strecker went to the district attorney's office and revealed "the child pornography incident" no one on the Board thanked him or gave any kind of approval; and, v) after Strecker went to the district attorney's office, Mark Headley told him that he "ought to be ashamed of [himself]" and, "it was very inappropriate for [Strecker] to be on a committee like this as a board member and certainly to take action as an individual on the board because [Strecker's] only authority as a board member is as the total board" and Connie Freriks and Norm Lambert agreed with and/or repeated these comments to Strecker. Deposition of Strecker, p. 144, line 8 (App. 396) - p. 149, line 10 (App. 398).

The comments to Strecker by Lambert are probably more properly characterized as criticisms as opposed to reprimands, and they clearly do not constitute adverse action. See *Colson,* 174 F.3d at 511-14 (criticism, attempted investigation, and circulation of recall petition containing false accusations against city council member plaintiff did not constitute adverse action sufficient to rise to level of First Amendment violation). Further, even assuming that the comments could qualify as "reprimands", they are nothing more than verbal reprimands and thus do not constitute adverse action. See Deposition of Strecker, p. 144, line 23 (App. 396) - p. 145, line 14 (App. 397); p. 149, line 11 - p. 150, line 20 (App. 398) (testifying that comments criticizing Strecker's actions were made in closed executive session of the Board, and, although Strecker assumes the comments were recorded in the executive session minutes, those minutes are confidential and he has never received a copy); *Id*; *Benningfield*, 157 F.3d at 377. Thus, Strecker's allegations regarding reprimands by Lambert do not state a constitutional violation.

Further, even assuming that Stecker's allegations stated a constitutional violation, Lambert is still entitled to qualified immunity from Strecker's claims because the summary judgment evidence does not show a violation of a clearly established right and because the actions of Lambert were objectively reasonable.   What Strecker is really complaining about is that Lambert and Board members exercised their own free speech rights by expressing their opinions to him about his activities.  Under the circumstances, and in light of the law as it existed at the time, other reasonable officials would not have believed that expressing their disapproval of Strecker's actions violated any constitutional rights.

*LaGrone's dismissal claim*

LaGrone's First Amendment claim, as stated in the Amended Complaint, is as follows: "On or about May 9, 2001, Plaintiff LaGrone informed Lambert's assistant, Henderson that she would cooperate with the criminal investigation of the criminal activities engaged in by the CFO Langley and the actions of Lambert and hospital attorney Mitchell in conspiring to conceal criminal evidence.   LaGrone was terminated within six days...." Plaintiffs' First Amended Complaint, p. 14.  Thus, LaGrone is alleging that her employment was terminated because of the conversation she had with Melody Henderson on May 9, 2001.  LaGrone's testimony concerning her conversation with Henderson on that day is as follows:  "And I went in and found her, and I said, Melody, I have just contacted the Texas Nurses Association on this child pornography.  I did not have any part in it, I will not have any part in it, and I will -- if I'm asked, I -- I will tell exactly what happened, and that was essentially all."  Deposition of Cynthia LaGrone, pp. 131, line 17 – p. 132, line 1 (App. 258).

Based on the allegations in the Amended Complaint and LaGrone's deposition testimony, Lambert is entitled to qualified immunity with regard to LaGrone's First Amendment claim

because: (i) she cannot show that there was an actual violation of her constitutional rights; (ii) LaGrone cannot show that Lambert violated a "clearly established" constitutional right; and, (iii) even if there had been a violation of a clearly established right, Lambert's actions were objectively reasonable under the circumstances and in light of existing law.

LaGrone's testimony shows that she did not actually engage in protected speech on a matter of public concern. Although LaGrone testified that on May 9, 2001 she told Melody Henderson that, if asked about the child pornography matter, she "will tell exactly what happened", there is no evidence that LaGrone actually cooperated with any investigation or said anything to an investigator. In fact, LaGrone's testimony is that no law enforcement authorities ever came to her and actually asked for her version of what happened, either before or after May 9, 2001. Deposition of Cynthia LaGrone, pp. 133, line 18 – 134, line 2 (App. 259). A plaintiff cannot establish a First Amendment claim when she has not actually engaged in protected activity. *Jones v. Collins*, 132 F.3d 1048, 1053 (5th Cir. 1998); *See also Barkoo v. Melby*, 901 F.2d 613 (7th Cir. 1990). When the speech at issue never occurred, there can be no constitutional deprivation. *Fogarty v. Boles*, 121 F.3d 886, 890 (3d Cir. 1997). In *Fogarty*, a public school teacher claimed she was punished based upon the school principal's erroneous belief that the teacher had contacted the press about a matter of public interest at the school. *Id.* at 887. The court denied the claim because the teacher failed to show that she actually engaged in conduct that was entitled to protection. *Id.* at 890. Under the foregoing authorities, Plaintiff LaGrone has not stated a First Amendment claim because she has no evidence to show that she actually spoke to anyone who was conducting a criminal investigation.

Further, whatever speech LaGrone engaged in did not involve a matter of public concern. One of the elements that a public employee must allege and prove in order to prevail on a free

speech retaliation claim is that the employee's speech involved a matter of public concern. *Breaux v. City of Garland*, 205 F.3d 150, 156 (5th Cir. 2000). The inquiry regarding whether LaGrone's speech addressed a matter of public concern is a question of law. *Anderson v. Pasadena Independent School District*, 184 F.3d 439, 444 (5th Cir. 1999). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147-148, 103 S. Ct. 1684, 75 L.Ed.2d 708 (1983). To make that determination, the Court is to examine the statements in issue and the circumstances under which they were made to see whether or not they are of a character which the principles of the First Amendment protect. *Id*. at 150 n. 10, 103 S.Ct. 1684 n. 10. Utilizing these standards, LaGrone's statements were not involving matters of public concern. According to LaGrone's testimony, she spoke out on two occasions that resulted in retaliation: a conversation with an attorney at the Texas Nursing Association; and, a conversation with Melody Henderson. Deposition of Cynthia LaGrone, pp. 273, line 3 – p. 274, line 9 (App. 294). Regarding her conversation with an individual at the Texas Nursing Association, the Amended Complaint states that LaGrone "contacted the Texas Nurses Association for advise (sic) concerning her duties and potential liability" presumably related to her concern that she had been given an envelope containing child pornography materials. Plaintiffs' First Amended Complaint, p. 12. LaGrone's deposition testimony reveals that she was essentially seeking legal advice from an attorney at the Texas Nurses Association. Deposition of Cynthia LaGrone, p. 127, line 25 – p. 128, line 13 (App. 257); p. 134, lines 3-20 (App. 259). Thus, the "content, form, and context" of this particular communication, i.e., a private phone call to a trade association attorney seeking legal advice, show that it was not a matter of public concern. The allegations in the Amended Complaint demonstrate that

LaGrone's purpose in making this phone call was not to express her views on any subject, but instead to simply gather information relevant to her own personal situation. Also, LaGrone's brief statement to Henderson that day was not a matter of public concern. As with the earlier conversation, LaGrone's statements to Henderson were made privately, between just the two of them. Deposition of Cynthia LaGrone, p. 131, line 12 – p. 132, line 4 (App. 258). See *Davis v. West Community Hospital*, 755 F.2d 455, 461 (5th Cir. 1985)(the fact that the communications are made "inhouse" does not necessarily destroy their protection under the first amendment, "but it is part of the context of the communication to be considered in determining whether the speech addressed a matter of public concern."). The gist of LaGrone's statement to Henderson was simply that she had not been involved in the child pornography incident, and that if she is asked about the subject, she will tell what happened. Again, LaGrone was not actually expressing her views on any matter. She was simply stating her intention to talk about a subject if asked. Also, LaGrone was never asked to, and never did, participate in any criminal investigation regarding this matter. Deposition of Cynthia LaGrone, pp. 133, line 23 – p. 134, line 2 (App. 259). Thus, LaGrone's conversation with Henderson on May 9, 2001 was not an instance of her speaking out on a matter of public concern.

Finally, LaGrone cannot show a violation of her constitutional rights because she cannot show that her alleged "protected speech" was a substantial motivating factor in the decision to terminate her employment with GPCH. The final element necessary to establish a Section 1983 retaliation claim for violation of First Amendment rights is that the plaintiff's speech must have motivated the defendant's action. *Breaux*, 205 F.3d at 156. Thus, LaGrone must show that her speech was protected by the Constitution *and* that the speech was a substantial or motivating factor in the adverse employment action. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,

429 U.S. 274, 287, 97 S. Ct. 568, 576, 50 L. Ed. 2d 471 (1977). In this case, LaGrone has no evidence to show that her speech in any way influenced the decision to eliminate her position (and thus end her employment) and the uncontroverted summary judgment evidence shows that her alleged statements did not play any role in this decision. Norm Lambert made the decision to eliminate LaGrone's position and terminate her employment. Deposition of Cynthia LaGrone, pp. 50, line 6 – p. 51, line 25 (App. 238); Affidavit of Norm Lambert (App. 676, para. 18). Melody Henderson played no part in the decision concerning the elimination of LaGrone's position. Affidavit of Melody Henderson (App. 814).[3] LaGrone has testified that she did not make any of the alleged "protected" statements to Norm Lambert. Deposition of Cynthia LaGrone, p. 132, lines 9-13 (App. 258). Further, she acknowledges that she has no knowledge and no evidence that Melody Henderson ever repeated her statements to Norm Lambert. Deposition of Cynthia LaGrone, pp. 132, line 14 (App. 258) – p. 133, line 7 (App. 259). The summary judgment evidence presented by Defendants also shows that Melody Henderson never repeated the alleged statement of LaGrone to Norm Lambert. The testimony from Melody Henderson shows that the only information Henderson provided to Lambert between May 9, 2001 and May 15, 2001 regarding any statements made by LaGrone was that LaGrone had stated she had gotten an attorney related to the Larry Langley incident because she needed to know what her liability was. Affidavit of Melody Henderson (App. 814). Thus, the summary judgment evidence shows that, at the time he made the employment decision, Lambert had no knowledge of LaGrone alleged "protected speech" and therefore, any protected speech could not have been a motivating factor in his employment decision. Further, as shown below, the actual reasons for

---

[3] LaGrone is not asserting a free speech retaliation claim against Henderson. See Response to Defendants Henderson and Whelchel's Motion to Dismiss, or Alternatively Motion to Sever.

Norm Lambert's decision to eliminate LaGrone's position are totally unrelated to any alleged statements made by LaGrone on May 9, 2001.

As shown above, LaGrone cannot establish the elements of her First Amendment retaliation claim against Lambert based on the elimination of he position. Assuming that she could establish the elements of her claim, Lambert is still entitled to qualified immunity because LaGrone cannot show he violated a "clearly established" constitutional right, and, even if there had been a violation of a clearly established right, Lambert's actions were objectively reasonable under the circumstances and in light of existing law. As shown above, an essential element of a first amendment retaliation claim is causation. First amendment retaliation claims are governed by the *Mt. Healthy* "mixed-motive" framework. *Gonzales v. Dallas County Texas*, 249 F. 3d 406, 412, n. 6 (5th Cir. 2001). Under this analysis a public official is not liable if he can prove that he would have taken the same adverse employment action even in the absence of the plaintiff's protected conduct. *Mt Healthy*, 429 U.S. 274, 287. Thus, if the evidence shows that another reasonable official could have believed that the employment decision in question did not violate clearly established law and could have taken the same employment action under the circumstances, qualified immunity should be granted. *Gonzales*, 249 F. 3d at 413.

As shown above, in the case at hand, Lambert could not have been motivated by the alleged protected speech because the undisputed summary judgment evidence shows that he did know about the protected speech at the time he made the employment decision. Further, the actual reasons for Lambert's decision to eliminate LaGrone's position were completely unrelated to her alleged protected speech. Cynthia LaGrone started working at Golden Plains Community Hospital in 1997. Deposition of Cynthia LaGrone, p. 12, lines 13-16 (App. 228). Beginning in September 1997 and throughout her career at the Hospital, Norm Lambert performed periodic

performance evaluations on Ms. LaGrone.  In each of these evaluations Lambert expressed at least some criticisms and concerns about LaGrone's performance as an employee of the Hospital. Affidavit of Norm Lambert (App. 675, para. 14, 15).  As early as September 1997, Lambert expressed a number of concerns about LaGrone's performance in her performance evaluation, including comments that LaGrone had difficulty "accepting ideas divergent from hers" that she has "covertly tried to undermined team decisions by discussing confidential information with others" that the  administrative team has "verbalized a level of distrust for her" that "she has at other times demonstrated actions that cause a lack of respect and trust from others" and that she can be "extremely controlling which tends to promote fear from those around her."  Deposition of Cynthia LaGrone, p. 73, lines 11-17 (App. 244); Deposition Exhibit 19 (App. 649-650). Further, as early as October of 1997, Norm Lambert had made the decision to terminate LaGrone's employment primary because of her strained relations with other Hospital staff. Deposition Exhibit 21 (App. 652-653); Affidavit of Norm Lambert (App. 675, para. 14). Although Lambert ultimately decided against terminating LaGrone's employment in 1997, he continued to express concerns about her performance as an employee, particularly her strained relations with Hospital staff, in subsequent performance evaluations.   Affidavit of Norm Lambert, attachment 5 (App. 771-797).

LaGrone alleges that she was an "exemplary employee" and that she received numerous awards.  Plaintiffs' First Amended Complaint, p. 11.  LaGrone acknowledges, however, that it was Lambert's job to evaluate her performance and his opinion was that she was not an exemplary employee.  Deposition of LaGrone, p. 110, line 5 (App. 253)- p. 111, line 7 (App. 253).  Further, the "CEO Award" that LaGrone refers to receiving in 1998 was actually a group award given to the business office, medical records, and quality assurance departments at the

Hospital. LaGrone did not receive an individual CEO award. Deposition of LaGrone, p. 111, line 8 (App. 253)-p. 112, line 16 (App. 253). Also, LaGrone received an award from the Hospital Board in 2001. She was given the award, however, at the suggestion of Jerry Strecker, one of the Plaintiffs. Strecker admits that, at the time he made the suggestion, he was not aware that numerous complaints had been made about LaGrone by hospital employees. Deposition of Strecker, p. 38, line 4 – p. 41, line 24 (App. 370-371).

Norm Lambert's concerns about LaGrone's performance as an employee and his contemplation of ending her employment began long before her protected speech, which allegedly occurred on May 9, 2001. The basis for Norm Lambert's concerns and criticisms concerning LaGrone were partly his own observations and interactions with Ms. LaGrone. Additionally, Lambert received a number of complaints from various employees at the Hospital with regard to Ms. LaGrone's behavior. Affidavit of Norm Lambert (App. 676, para. 16). The employees that complained to Norm Lambert about LaGrone on various occasions included Veronica Espinoza, Teresa Brown, Kimberly Lopez, and Kelly McDonald. Affidavits of Veronica Espinoza, Teresa Brown, Kimberly Lopez, Kelly McDonald (App. 835-843). LaGrone has acknowledge that she has no evidence to refute the fact that Norm Lambert received numerous complaints from other employees regarding her behavior. Deposition of Cynthia LaGrone, p. 94, line 17 (App. 249)-p. 95, line 11 (App. 249).

One additional factor also played a role in Lambert's decision to eliminate LaGrone's position when he did. In May of 2001, the composition of the Hospital board changed. Prior to this change, the composition of the board was such that Lambert was concerned that any action he attempted to take with regard to LaGrone's employment would not be supported by the Board. After the makeup of the Board changed, Lambert felt more comfortable that any employment

action he would take with regard to LaGrone would be upheld if reviewed and voted on by the board. Affidavit of Norm Lambert (App. 676, para. 19). Thus, Lambert's perception about the amount of support he would receive from the board with regard to any employment action concerning LaGrone and his perception of how that support had changed in May 2001 played a role in his decision to eliminate LaGrone's position at the time. See Deposition of Dr. Jerry Strecker, p. 199, line 25 – p. 201, line 14 (App. 410-411). This consideration by Lambert is a completely legal and legitimate factor that he was allowed to use in making an employment decision.

The summary judgment evidence shows that Lambert's reasons for his decision to eliminate LaGrone's position are wholly unrelated to her alleged protected speech which she engaged in on May 9, 2001. The evidence shows that there had been a long history of Lambert expressing concerns and criticisms of LaGrone's performance, particularly related to her inability to get along with Hospital staff, and that he had strongly considered terminating her employment as early as October 1997. The summary judgment evidence also shows his concerns about LaGrone's behavior continued throughout her employment at Golden Plains Community Hospital and, at the point he felt that his decision would be supported by the board, he took employment action against LaGrone based on his concerns.

In her deposition, LaGrone testified that in addition to the decision to terminate her employment, her belief is that Lambert also retaliated against her by holding a secret meeting regarding her possible termination in 1997, and by giving her negative evaluations throughout her employment at the Hospital. Deposition of LaGrone, pp. 33, lines 1-19 (App. 234); p. 54, line – p. 56. line 1 (App. 239). In the First Amended Complaint, however, the only act of retaliation complained about by LaGrone, and the only adverse employment action alleged by

LaGrone, is her termination from employment on May 15, 2001. Plaintiffs' First Amended Complaint, pp. 12, 14. Thus, LaGrone has not pled that the alleged "secret meeting" regarding her termination in 1997 or her negative evaluations are part of her retaliation claim and these incidents are not a part of this litigation. Assuming that LaGrone does attempt to make these incidents a part of this lawsuit, they should be dismissed on summary judgment on the following reasons. First, any incidents occurring in 1997 with regard to Ms. LaGrone's employment are barred by the applicable statute of limitations. Section 1983 claims are governed by the Texas two-year personal injury statute of limitations. Tex. Civ. Prac. & Rem. Code §16.003; *Slack v. Carpenter*, 7 F.3d 418 (5th Cir. 1993). Thus, any claim LaGrone might have had for actions taken in 1997 are now bared by limitations. Additionally, LaGrone's allegations concerning her performance evaluations are insufficient as a matter of law because, under the circumstances they do not constitute adverse action and because she has not alleged any protected activity other than her statements on May 9, 2001. Thus, any attempt by LaGrone to include additional claims of retaliation above and beyond the termination of her employment should be dismissed on summary judgment for the reasons given above and because these incidents are not included in the controlling pleadings in this case.

*Additional First Amendment allegations*

Plaintiffs' additional First Amendment allegations against Lambert, that he wrote a letter that was critical of "certain individuals" and that he did not inform LaGrone of the nature or contents of certain material he provided to her, do not state a claim because they do not allege any retaliation or adverse action taken by Lambert.

2.    EQUAL PROTECTION CLAIMS

Plaintiffs Sangalang, Trirogoff, Ed Quiros, and C.P. Quiros, all of Filipino origin, assert in their Amended Complaint that Lambert "violated their right to Equal Protection based on discrimination by race resulting in the loss of/or interference with tangible interests, privileges and property rights. Plaintiffs' First Amended Complaint, p. 15. Plaintiffs also make allegations concerning Lambert's actions toward a Dr. Viola. Plaintiffs' First Amended Complaint, p. 15. Plaintiffs Sangalang, Trirogoff, Ed Quiros, and C.P. Quiros have no evidence to establish an equal protection violation by Lambert and he is entitled to qualified immunity on this cause of action.

Plaintiffs' have given the following testimony regarding their equal protection claims against Lambert. Sangalang alleges that Dr. Timmons was given preferential treatment regarding the Borger Rural Clinic and the Fritch Clinic, but he admits that the preferential treatment of Timmons was not based on the fact that any of the Plaintiffs are Filipino. Deposition of Sangalang, p. 241, line 18 - p. 243, line 16 (App. 136). He alleges that Lambert took actions against Dr. Viola, a Filipino, however he acknowledges that Viola currently has emergency room privileges and is the director of home health at GPCH. Deposition of Sangalang, p. 243, line 17 - p. 245, line 2 (App. 137). Sangalang alleges that Lambert harassed him by sending him letters related to peer review matters, however, Sangalang admits that he has no evidence that those actions by Lambert were based on the fact that he is Filipino and he testified that it "wasn't related" to his Filipino origin. Deposition of Sangalang, p. 246, line 1 (App. 137) - p. 251, line 24 (App. 138). Sangalang also admits that there is no connection between his equal protection claim and the fact that newer doctors have received income guarantee agreements. Deposition of Sangalang, p. 253, line 13 - p. 254, line 12 (App. 139). Dr. Trirogoff alleges that Lambert made

negative comments about Filipinos, but she has no evidence that he made any comments about her. She also alleges that Lambert convinced the Defendant doctors not to use her anesthesia services. Deposition of Trirogoff, p. 117, line 23 - p.118, line 20 (App. 192). She admits, however, that she has no real evidence that Lambert did not want the Defendant doctors to use her services, just her "feelings" and she has no evidence that Lambert actually influenced any of the doctors' choices regarding anesthesia providers. Deposition of Trirogoff, p. 115, line 13 - p. 116, line 19 (App. 191); p. 238, lines 2-13 (App. 222). Ed Quiros alleges that Lambert made snide remarks about the Filipino doctors, but he admits that none of the remarks were directly about him and that he never personally heard Lambert make such remarks. Deposition of Ed Quiros, p. 119, line 25 - p. 120, line 17 (App. 446); p. 134, lines 9-12 (App. 450). He alleges that, in October or November of 2002, some undisclosed person in medical records told him that Lambert had said to "keep an eye" on Quiros and that this individual then called Quiros and asked him if he was part of the lawsuit. Quiros would not or could not reveal the name of this person in deposition. Quiros' only evidence that this alleged statement by Lambert was based on his Filipino origin is that the individual from medical records told him that this has not happened when the new doctors have come to look at records. Quiros does not know whether the "new" doctors would include Dr. Perales, who is also Filipino. Deposition of Ed Quiros, p. 120, line 18 (App. 446) - p. 130, line 21 (App. 449). Dr. C.P. Quiros is not alleging that Lambert discriminated against her. Deposition of C.P. Quiros, p. 126, line 24 – p. 127, line 9 (App. 563).

Plaintiffs' deposition testimony reveals that they have no evidence to support their equal protection claims against Lambert. In order to state a claim of racial discrimination under the Equal Protection Clause and §1983, Plaintiffs must demonstrate intentional discrimination based on race by Lambert. See *Washington v. Davis*, 426 U.S. 229, 238-42, 96 S.Ct. 2040, 2046-49, 48

L.Ed.2d 597 (1976); *Vera v. Tue*, 73 F.3d 604, 609 (5th Cir. 1996). Plaintiffs must prove purposeful discrimination by Lambert that causes injury. *Johnson v. Rodriguez*, 110 F.3d 299, 306 (5th Cir. 1997). Discriminatory purpose means that Lambert took a particular action because of its *adverse effects* on an identifiable group. *Id* at 307; *Personnel Amin'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Plaintiffs have not identified any such action by Lambert that caused injury to them because of their Filipino origin. Plaintiffs' allegations that Lambert made statements to third parties about Filipinos do not amount to actionable discriminatory acts by Lambert. Quiros' allegation that Lambert instructed some unknown person to "keep an eye" on him also is not an actionable discriminatory act and Quiros has no real evidence that this statement, if made, was in any way related to his Filipino origin. The Plaintiffs' allegation that Lambert took some action against Dr. Viola also does not provide the Plaintiffs in this lawsuit with an equal protection claim. Sangalang admits that Lambert's alleged actions of giving preferential treatment regarding clinics, and harassing him related to peer review matters are not based on his Filipino origin. Finally, Trirogoff admits that she has no evidence that Lambert attempted to convince doctors not to use her services.

Plaintiffs' also allege that the Plaintiff Doctors "have always had agreements with the Hospital to work as independent contractors, paid directly by patients" and, on the other hand, the majority of the Defendant physicians are Caucasian men, hired as employees with guaranteed salaries between $165,000 and $350,000 per year and other benefits. Plaintiffs' First Amended Complaint, p. 15. These allegations do not state an equal protection claim. The summary judgment evidence shows that the Defendant physicians have not been "hired as employees with guaranteed salaries." Instead, in an effort to recruit more doctors to Borger, the Hospital, during the years 1999 and 2000, entered into recruitment contracts with some of the Defendant

physicians which included income guarantees. Affidavit of Norm Lambert (App. 673, para. 7, 9). These recruitment contracts were not entered into with the Defendant physicians because of their race or national origin, but instead to provide an incentive for the doctors to establish their medical practices in Borger. Id; Affidavit of Randall Young (App. 901-903). In fact, one of the doctors with whom the Hospital entered into a recruitment contract was Dr. Perales, a Filipino. Affidavit of Norm Lambert(App. 673, para. 9); Deposition of Holland, p. 78, lines 10-22 (App. 20). The Plaintiff doctors were recruited to Borger by the Hospital between 1977 and 1994.[4] Plaintiffs' First Amended Complaint, p. 4. Some of the Plaintiff doctors, including Dr. Sangalang, a Filipino, had recruitment agreements with the Hospital that included income guarantees when they first came to Borger. Affidavit of Norm Lambert(App. 673, para. 9). Thus, Plaintiffs have no evidence to support their allegations that the agreements between the Hospital and the Defendant Physicians are in based on race or that the agreements establish an equal protection violation. Further, the Plaintiffs have acknowledged, through deposition testimony, that recruitment agreements are only appropriate with physicians that are new to the community, and that it would be inappropriate for the Hospital to enter into such an agreement with the Filipino Plaintiff doctors because they have all been practicing at the Hospital in Borger for several years. See e.g. Deposition of Dr. Sangalang, p. 253, line 13 (App. 139) - p. 257, line 5 (App. 140). Thus, Plaintiffs equal protection allegations concerning differential treatment of the Defendant Physicians also fail because the summary judgment evidence shows that the Plaintiff physicians and Defendant Physicians are not similarly situated. "To state an equal protection claim, the Plaintiffs must allege, *inter alia*, that similarly situated individuals have been treated differently." *Yates v. Stalder*, 217 F.3d 332, 334 (5th Cir. 2000); also see *Nordlinger*

---

[4] None of the Defendants were affiliated with GPCH during this time period.

*v. Hahn*, 505 U.S. 1, 10 (1992) (the equal protection clause keeps governmental decisionmakers from treating differently persons "*who are in all relevant respects alike*").

Through their discovery responses, Plaintiffs have also made allegations about preferential treatment of some of the Defendant Physicians with regard to other matters such as the sale of the Borger Rural Health Clinic to Defendant Dr. Timmons, placing Defendant doctors as Directors of other Hospital clinics, and the Hospital referring indigent care patients to the Defendant doctors. These allegations likewise do not state an equal protection claim because the Defendant Physicians involved are not similarly situated to the Plaintiff Physicians. As stated above, most of the Defendant Physicians were recruited to Borger by the Hospital in 1999-2000, and, as part of the effort to recruit the Physicians to Borger, they were offered and accepted recruitment contracts that included income guarantee agreements and other incentives. Affidavit of Norm Lambert (App. 673, para. 9). Once a physician has been recruited to the community and is under an income guarantee agreement, it is common for a hospital to help the new physician build a practice. This is beneficial both to the hospital and to the community. Affidavit of Randall Young (App. 901-903). Some of the ways in which the Hospital has attempted to help the Defendant Physicians build their medical practices in Borger has been to set them up in the Hospital's rural health clinics and to refer new indigent care patients (whose medical care is paid for by the Hospital District pursuant to state law) to the recruited physicians. Affidavit of Norm Lambert(App. 673-674, para. 10-12); Affidavit of Randall Young(App. 901-903). Thus, the Hospital's so called "preferential treatment" of some of the Defendant Physicians has actually been efforts on the part of the Hospital District to recruit and retain additional doctors for Hutchinson County and reduce the Hospital District's financial obligations under the income guarantee agreements. The Plaintiff Physicians and Defendant Physicians are not at all "similarly

situated" with regard to these matters because, as the Plaintiffs' pleadings explain, they were recruited to Borger between 1977 and 1994, and they have had established medical practices there for many years. Further, there is no evidence that the "preferential treatment" of the Defendant Physicians is in any way related to race or national origin. As stated above, one of the newly recruited Defendant Physicians is Dr. Perales, a Filipino. Additionally, the Plaintiffs with the primary complaints about the rural health clinics and indigent care patients are Drs. Holland and Elston.[5] Deposition of Dr. Holland, p. 229, line 12 (App. 58) - p. 237, line 22 (App. 60); Deposition of Dr. Elston, p. 29, line 9 (App. 304) - p. 38, line 17 (App. 306). Both Holland and Elston have been practicing medicine in Borger for many years and neither of them are Filipino.

Plaintiffs' allegations about the peer review process also do not state an equal protection violation. First, Plaintiffs' Complaint does not allege that the Filipino Plaintiff physicians have been singled out or treated differently than others in terms of peer review. Instead, Plaintiffs' Complaint states that, from 2001-2002, Sangalang, Trirogoff, Ed Quiros *and Holland* have had cases peer reviewed. Plaintiffs' First Amended Complaint, p. 13. Dr. Holland is not of Filipino origin. Also, the Plaintiffs have no evidence concerning how often the Defendant Physicians have had cases peer reviewed during the same time frame. Deposition of Dr. C.P. Quiros, p. 49, lines 5-17 (App. 544); Deposition of Dr. Ed Quiros, p. 69, line 20 - p. 70, line 14 (App. 434); Deposition of Dr. Trirogoff, p. 106, lines 6-13 (App. 189); Deposition of Dr. Elston, p. 65, line 11 - p. 67, line 23 (App. 313); Deposition of Dr. Holland, p. 115, line 25 - p. 116, line 11 (App. 29); Deposition of Dr. Sangalang, p. 115, lines 5-19 (App. 104); p. 121, lines 3-13 (App. 106).

---

[5] The summary judgment evidence shows that a number of the Plaintiff Physicians have continued to treat indigent care patients and receive payment from the Hospital through 2002. Affidavit of Norm Lambert, Attachment 4. The summary judgment evidence also shows that Dr. Holland was a member of the Hospital District Board at the time the sale of the Borger Rural Health Clinic to Dr. Timmons was considered and approved by the Board and she did not vote against the sale. Id; Deposition of Dr. Holland, p. 236, line 16 – p. 237, line 18 (App. 59-60).

So, there is no evidence to support a contention that the Filipino Plaintiffs have been subjected to differential treatment regarding the peer review process.

Because Plaintiffs have no evidence to show that Lambert violated the equal protection rights of the Filipino Plaintiffs, the Plaintiffs cannot overcome the first element of their qualified immunity defense. Lambert is further entitled to qualified immunity with regard to the equal protection claims because the summary judgment evidence shows, and Plaintiffs cannot controvert, that his actions did not violated clearly established law his actions were objectively unreasonable.

3.    OFFICIAL CAPACITY CLAIMS

It is unclear whether Plaintiffs are attempting to sue Lambert in his official capacity, as opposed to his individual capacity. In the event that Plaintiffs' pleadings are interpreted as asserting claims under §1983 against Lambert in his official capacity, Lambert requests that these claims be dismissed. A suit against a government official in his or her official capacity is a suit against the governmental entity. *Turner v. Houma Mun. Fire and Police Civil Service Bd.*, 229 F.3d 478, 483 (5th Cir. 2000). In order to establish liability under Section 1983 against a local governmental entity, Plaintiffs must prove three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F. 3d 567, 578 (5th Cir. 2001). It is only "when execution of a government's [unconstitutional] policy or custom… *inflicts the injury*", that the governmental entity can be liable. *Monell v. New York Dept. Soc. Serv.*, 436 U.S. 658, 694, 98 S.Ct. 2018 (1989). Because Plaintiff have not alleged or offered evidence of an official policy which was the moving force behind any constitutional violation and because, as shown above, they cannot establish that any policymaker violated the Plaintiffs' constitutional rights, any claims under

§1983 against Lambert in his official capacity should be dismissed.

B.    ANTITRUST CLAIMS

The Brief in Support of Defendants Headley, Freriks, Zeni, Wheeler, Rullman, and Ribeiro's Motion for Summary Judgment sets out extensive arguments and authorities showing that Plaintiffs' antitrust claims fail as a matter of law and should be dismissed as to all Defendants in this suit.   The briefing is contain in Section B of the Brief in Support of Defendants Headley, Freriks, Zeni, Wheeler and Rullman's Motion for Summary Judgment under the heading of Antitrust Claims and Defendant Lambert incorporates that portion of the briefing herein by reference.   More specifically, Lambert is entitled to judgment as a matter of law with regard to Plaintiffs antitrust claims because: i) Plaintiffs lack standing to bring their antitrust claims because they cannot show an antitrust injury and because they are not proper antitrust plaintiffs; ii) Plaintiffs' antitrust claims fail jurisdictionally because Plaintiffs have no evidence to show an effect on interstate commerce; iii) Plaintiffs cannot established the relevant product and geographic markets; iv) Plaintiffs cannot show an unreasonable restraint of trade to support their Section 1 Sherman Act claim; v) Plaintiffs cannot prove "concerted action" to support their Section 1 Sherman Act claim; vi) Plaintiffs have no evidence to support their monopoly claim under Section 2 of the Sherman Act.

As a government official, Lambert is also immune from damages, interest on damages, costs, and attorney's fees with regard to Plaintiffs' antitrust claims pursuant to the Local Government Antitrust Act ("LGAA"). 5 U.S.C. §35(a); *Patel v. Midland Memorial Hosp. and Medical Center*, 298 F.3d 333 (5th Cir. 2002).   This provision shields government officials from personal liability and applies even when the officials are sued in their individual capacity. *Martin v. Stites*, 31 F.Supp.2d 926, 930 (D. Kansas 1988)("plaintiffs claims for damages against

defendants in their individual capacities are barred by the LGAA, and are dismissed."); See also *Sandcrest Outpatient Services v. Cumberland County Hospital System*, 853 F.2d 1139, 1145, n.7. The only condition for application of the immunity granted to a government official by §35(a) is that the official must have been "acting in an official capacity." 5 U.S.C. §35(a). "[A]n affirmative grant of explicit authority is not required for an employee or government official to be acting in an official capacity under the LGAA...." *Sandcrest Outpatient*, 853 F.2d at 1145. Instead, "the phrase 'acting in an official capacity' includes those lawful actions, undertaken in the course of a defendant's performance of his duties, that reasonably can be construed to be within the scope of his duties and consistent with the general responsibilities and objectives of his position." *Id*; See also *Thatcher Enterprises v. Cache County Corporation*, 902 F.2d 1472, 1477-78 (10th Cir. 1990). Further, "[t]he LGAA makes no provision for consideration of a defendant's motives...." *Sandcrest Outpatient*, 853 F.2d at 1146.

In the case at hand, Lambert was clearly acting in his official capacity, as that term is defined by the case law, with regard to the Plaintiffs' antitrust allegations. The only factual allegation against Lambert in the Antitrust Section of Plaintiffs' Amended Complaint is that Lambert, along with the Board Members, "began requiring all doctors who performed service at the Hospital to designate a person to provide anesthesia to patients." Plaintiffs' First Amended Complaint, p. 18. Assuming that this allegation is true, this is certainly the type of action regarding the administration of the Hospital that reasonably could be construed to be within the scope of Lambert's duties and consistent with his general responsibilities and objectives. The Hospital CEO's duties, as set out in the Hospital District's bylaws, are broad. The Bylaws state that the CEO "shall be given the necessary authority and held responsible for the management of the hospital in all its departments subject only to the policies enacted by the Board or any

committees to which the Board has delegated power for such action." Affidavit of Norm Lambert, Attachment 1 (685, para. 3.1). Other factual allegations made against the Hospital Defendants by Plaintiffs related to their antitrust claims include: recruitment of unnecessary physicians in an area where physician's patient loads were limited; selling the rural health clinic to Dr. Timmons at a substantially reduced amount without offering it to other physicians; firing Dr. Holland from the Women and Children's Clinic in favor of Dr. Rogers and Mann[6]; directing indigent care patients to new physicians; and, "giving" the Fritch Clinic to Dr. Timmons, without offering it to other physicians. Again, these actions of recruiting physicians, selecting particular doctors to work in hospital clinics, and directing indigent care patients (whose medical care is paid for by the Hospital District) to doctors currently under income guarantee agreements, are the type that can reasonably be construed to be within the scope of the Hospital CEO's broad duties. See Affidavit of Randall Young. Finally, the a number of the Plaintiffs have acknowledged that Lambert was acting within the scope of his official duties with regard to the allegations in this case. Deposition of Sangalang, p. 217, line 24 - p. 218, line 2 (App. 130); Deposition of Holland, p. 174, line 5 - p. 176, line 2 (App. 44); Deposition of Ed Quiros, p. 443, lines 9-14 (App. 527); Deposition of C.P. Quiros, p. 177, lines 11-24 (App. 576). Therefore, Lambert in his individual capacity is immune from any antitrust claims for damages, interest, costs, or attorney's fees.

To the extent Lambert is sued in his official capacity, he enjoys absolute immunity from damages, interest, costs, or attorney's fees under the LGAA. 15 U.S.C. §35(a); *Thatcher v. Cache County Corp.*, 902 F.2d 1472, 1477 (10th Cir. 1990).

---

[6] In her deposition, Dr. Holland testified that she did not have a contract regarding the Women and Children's Clinic, instead she had an "agreement" that could be terminated at any time by either party. Deposition of Dr. Holland, p.

C.     LAGRONE'S EMPLOYMENT DISCRIMINATION CLAIM

In Plaintiffs' Amended Complaint, LaGrone alleges that her employment was terminated based on her age and that she has exhausted her administrative remedies with the EEOC. Plaintiffs' First Amended Complaint, p. 12.   Lambert is entitled to summary judgment on LaGrone's age discrimination claim.   To the extent LaGrone is suing Lambert in his individual capacity, he is entitled to summary judgment because he is not a proper defendant.   Golden Plains Community Hospital was LaGrone's employer, not Lambert in his individual capacity, and thus any claim brought against him individually under the Age Discrimination in Employment Act or Title VII should be dismissed.   Affidavit of Lambert; See *Stults v. Conoco, Inc.*, 76 F.3d 651, 655 (5th Cir. 1996).

Further, LaGrone did not exhaust her administrative remedies with regard to her age discrimination claim.   LaGrone's employment with GPCH ended on May 15, 2001.   LaGrone filed her Charge of Discrimination on or about October 30, 2001.   However, her Charge of Discrimination made no mention whatsoever of age discrimination and, in fact, the Charge does not even state her age.   See Deposition of LaGrone, p. 41, line 25 - p. 43, line 12 (App. 236); Deposition Exhibit No. 18 (App. 644-648).   LaGrone's October 30, 2001 Charge of Discrimination did not exhaust administrative remedies with regard to her age claim because the EEOC could not have reasonably been expected to have investigated a claim of age discrimination based on that Charge.   *Thomas v. Texas Department of Criminal Justice*, 220 F.3d 389, 395 (5th Cir. 2000)(the scope of a federal employment discrimination suit is limited to the scope of the EEOC investigation which can reasonably expected to grow out of the Charge of Discrimination), citing *Young v. City of Houston*, 906 F.2d 177, 179 (5th Cir. 1990).   LaGrone's

233, line 20 – p. 234, line 19.

former counsel has now provided counsel for Hospital Defendants with a copy of an Amended Charge of Discrimination dated and signed on April 22, 2002, that adds the allegation of age discrimination. (App. 918-922).[7]  LaGrone has no evidence showing that this Amended Charge was ever filed with or investigated by the EEOC or the Texas Commission on Human Rights. Even assuming that this Charge was filed, it does not exhaust LaGrone's administrative remedies regarding her age claim because it was executed well over 300 days after the employment action was taken on LaGrone.  As stated above, LaGrone's employment with GPCH ended on May 15, 2001.  Her amended Charge of Discrimination was completed and signed approximately 342 days later.  As a prerequisite to filing an age discrimination claim, LaGrone was required to file a Charge of Discrimination asserting age discrimination within 300 days of the employment action. *Julian v. City of Houston, Tex.*, 314 F.3d 721, 725-26 (5th Cir. 2002).  Because she did not do so, her age discrimination claim is time-barred.  Further, LaGrone's Amended Charge, even if it was filed, does not relate back to her original Charge because the original Charge made no mention of age discrimination.  29 C.F.R. §1601.12(b); See also *Taxey v. Maricopa County*, 237 F.Supp.2d 1109, 1113 (D. Arizona, 2002)(claimant's amended charge of discrimination alleging national origin discrimination did not relate back to her original charge alleging age discrimination where original charge did not mention national origin discrimination).

Additionally, LaGrone's age discrimination claim should be dismissed because GPCH had legitimate, non-discriminatory reasons for the employment decision affecting LaGrone and she cannot show that the reasons are pretexts for discrimination.  See *Price v. Federal Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002).  As shown above, the decision to eliminate LaGrone's

---

[7] This Amended Charge of Discrimination was provided by facsimile to counsel for Hospital Defendants for the first time on February 28, 2003.  GPCH never received this Amended Charge during the course of the Texas Commission

position was based primarily on Lambert's longstanding concerns about her performance, as well as other factors, none of which had anything to do with her age. Lambert has thus set out legitimate non-discriminatory reasons for the employment decision. LaGrone has no evidence to raise a fact issue regarding pretext. The only evidence LaGrone could come up with to support her contention that Lambert discriminated against her based on her age was that she and Lambert discussed her upcoming retirement on two occasions, first when he discussed terminating her employment in 1997, and later in February of 2001. Deposition of LaGrone, p. 63, line 14 (App. 241) p. 72, line 9 (App. 243). She acknowledges that, when she came to work at GPCH, she informed the Board that she was coming back to Borger to retire. Deposition of LaGrone, p. 67, line 10 (App. 242) - p. 70, line 3 (App. 243). She further testified that when Lambert talked with her about the possibility of terminating her employment in 1997, she brought up the fact that it would not be many more years before she retired, apparently in an attempt to convince Lambert not to terminate her. Deposition of LaGrone, p. 70, lines 4-22 (App. 243). So her testimony shows that she raised the issue of retirement with Lambert. She also admits that her allegations of age discrimination against Lambert are based only on her personal belief and not on any evidence. Deposition of LaGrone, p. 70, line 23 - p. 72, line 9 (App. 243).

Finally, it is unclear whether LaGrone is attempting to assert a claim for retaliation under the federal anti-discrimination statutes. To the extent she is asserting such a claim, it should be dismissed because she has no evidence that she opposed a wrongful employment practice as required to support a claim of retaliation under either Title VII or the ADEA. See LaGrone Deposition, p. 57, line 25 - p. 60, line 19 (App. 240); Deposition Exhibit 18 (App. 646-648); Affidavit of Norm Lambert, Attachment 6 (App. 798-799).

on Human Rights investigation. Lambert Affidavit (App 677).

*State Law Claims*

D.    OFFICIAL IMMUNITY

As a governmental official, Lambert is entitled to official immunity from Plaintiffs' state law claims.  Under Texas law, governmental employees and officials are entitled to official immunity for (1) the performance of discretionary duties (2) that are within the scope of their authority, (3) provided that they acted in good faith.  *Telthorster v. Tennell*, 92 S.W.3d 457, 461 (Tex. 2002).  "Texas law of official immunity is substantially the same as federal qualified immunity law."  *Wren v. Towe*, 130 F.3d 1154, 1160 (5th Cir. 1997) (citing *Cantu v. Rocha*, 77 F.3d 795, 808 (5th Cir. 1996)).  Texas official immunity skips the "clearly established law" step and "focuses solely on the objective legal reasonableness of the officer's conduct."  *Shaboon v. Duncan*, 252 F.3d 722, 729 (5th Cir. 2001).  Under that test, a defendant is immune "if *any* reasonably prudent offic[ial] could have believed the [defendant's] conduct was consistent with the plaintiff's rights."  *Cantu*, 77 F.3d at 808 (emphasis added) (citing *City of Lancaster v. Chambers*, 883 S.W.3d 650, 656-657 (Tex. 1994)).  In order to overcome a defendant's showing of entitlement to official immunity, "the plaintiff must show that *no* reasonable person in the defendant's position could have thought the facts were such that they justified defendant's acts."  *Tamez v. City of San Marcos*, 118 F.3d 1085, 1097 (5th Cir. 1997)(quoting *Chambers* at 697) (emphasis added, ellipse and internal quotation marks omitted).  Although state law governs the substance of the Plaintiffs' common law claims and the Defendants' official immunity defense, federal law controls the procedure for deciding the question.[8]  *Exxon Corp. v. Burglin*, 42 F.3d 948, 950 (5th Cir. 1995); *Washington v. Department of Transp.*, 8 F.3d 296, 300 (5th Cir. 1993).

Accordingly, federal standards and procedures for summary judgment are used for pendent state claims. *Ellis v. Weasler Engineering Inc.*, 258 F.3d 326, 336-337 (5th Cir.) ("Whether the evidence . . . is sufficient to create an issue of fact for the jury or will permit the court to enter judgment as a matter of law is governed by federal rather than state law"), *amended on other grounds on denial of rehearing*, 274 F.3d 881 (5th Cir. 2001); *Threlkeld v. Total Petroleum, Inc.*, 211 F.3d 887, 891 (5th Cir. 2000) (after judging fact issues according to federal law, the court "appl[ies] state law to the facts as found").

As shown below, Plaintiffs state law claims against Lambert fail because they cannot establish all of the essential elements of their claims. Further, Lambert is entitled to dismissal based on official immunity. The summary judgment evidence shows that, with regard to all of the Plaintiffs allegations against Lambert, he was performing discretionary duties, within the scope of his authority and, as shown below, he acted in good faith.

E.      DEFAMATION/BUSINESS DISPARAGEMENT

Plaintiffs assert the following claims of defamation and/or business disparagement against Lambert at pages 7-9 of their Amended Complaint (1) "Lambert in concert with other Defendants caused an article to appear" in the newspaper entitled "Sangalang Guilty of Malpractice"; (2) Lambert telling the Hospital Board that Plaintiff Holland committed acts constituting abandonment of patients on a weekend when she had no patients; and, (3) Lambert accusing Plaintiff Trirogoff of refusing to treat a patient and breaching a contract with the Hospital.

---

[8] This division of roles, originally developed for diversity cases, has been followed when deciding pendent state claims accompanying federal civil rights claims. *See, e g , Mowbray v. Cameron County, Tex.*, 274 F.3d 269, 280-281 (5th Cir. 2001), *cert. denied*, ___U.S. ___, 122 S.Ct. 1912 (2002).

Plaintiffs must establish the following elements to support their defamation claims: (1) the defendant published a statement of facts; (2) the statement referred to the plaintiff; (3) the statement was defamatory; (4) the statement was false; (5) any alleged statement was published by the defendant negligently or intentionally; and (6) the plaintiff suffered an actual injury. *See WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998). Libel is a written defamatory statement which tends to injure the plaintiff's reputation, thus exposing the plaintiff to "public hatred, contempt, ridicule, or financial injury, or impeach her honesty, integrity, virtue or reputation." *Halbert v. City of Sherman*, 33 F.3d 526, 529 (5th Cir. 1994). Slander is a defamatory statement that is orally communicated or published to a third person without justification or excuse. *W.G. Pettigrew Distrib. Co. v. Borden, Inc.*, 976 F. Supp. 1043, 1059 (S.D. Tex. 1996), *aff'd*, 127 F.3d 34 (5th Cir. 1997); *Cain v. Hearst Corp.*, 878 S.W.2d 577, 580 (Tex. 1994).

Plaintiffs' allegation that Lambert and other Defendants caused an article to appear in the newspaper with the headline "Sangalang Guilty of Malpractice" is frivolous and has no evidentiary support. Sangalang has admitted that he has no evidence to support the allegation that the Defendants caused this particular article to be published and he has no evidence that any Defendant in any way influenced the wording of the article. Deposition of Sangalang, p. 25, line 22 - p. 27, line 16 (App. 82).

Plaintiff Holland's allegation that Lambert falsely accused her of abandoning patients should also be dismissed. The summary judgment evidence shows that Lambert did not make the statement as alleged by Holland. Holland believes Lambert discussed this matter in an executive session of a Board meeting, but she did not actually hear the alleged statement and admits that she does not know for sure what Lambert said. Deposition of Holland, p. 41, line 12 - p. 42, line 15 (App. 11). Lambert's actual statements were that Holland's actions "possibly

could have been considered abandonment of patients." Affidavit of Norman Lambert (App. 678, para. 25). Because this was a statement of opinion, not fact, it is not actionable. Assuming, however, that Lambert had made a definitive statement of fact that Holland abandoned her patients, such a statement is not defamation because it would have been substantially true. Holland has testified that she did in fact leave town on the weekend preceding September 12, 2001 without the "usual call coverage." Deposition of Holland, p. 41, line 6 - p. 44, line 18 (App. 11). Holland does testify that there were extenuating circumstances, namely that shortly before she had planned to leave town, she received notice that a number of the physicians who are now Defendants would no longer provide call coverage for her. Deposition of Holland, p. 43, line 25 - p. 44, line 14 (App. 11). The reason given by the Defendant physicians for ending coverage was that Dr. Holland and the other Plaintiff doctors had recently threatened to file a lawsuit against the Defendant doctors. Deposition of Holland, p. 45, line 11 - p. 46, line 9 (App. 12). Further, Holland acknowledges that she was responsible for this case being peer reviewed. Deposition of Holland, p. 113, line 15 - p. 114, line 2 (App. 29). Regardless of the circumstances, Dr. Holland's actions of leaving town without specifically arranging for coverage can reasonably be viewed as patient abandonment. Affidavit of George Parsley (App. 904-907). Thus, a statement that Holland had abandoned her patients on the weekend in question is substantially true.

Lambert is also entitled to summary judgment on Holland's defamation claim based on official immunity. The summary judgment evidence shows that this incident involving Holland came to the attention of the Hospital administration because an "occurrence report" was made about the incident. The occurrence report was followed up on according to normal Hospital procedure. Affidavit of Melody Henderson (App. 813). The only settings where Lambert

discussed the incident were confidential meetings within the Hospital that qualified as either peer review or medical committee meetings under Texas law. Affidavit of Norm Lambert (App. 678, para. 25); Tex. Occ. Code §160.007 and Tex. Health & Safety Code § 161.032. The summary judgment evidence shows that it was proper for Lambert to bring this matter to the attention of the Board and that other reasonable administrators could have viewed Holland's actions as patient abandonment could have acted similarly in bringing the incident to the attention of the Board. Affidavit of George Parsley (App. 904-907). Further, because Lambert discussed this matter only within appropriate peer review or medical committee settings, qualified privilege applies and Holland has no evidence of malice. Therefore, Lambert is also entitled to summary judgment on Holland's defamation claims based on official immunity and the defense of qualified privilege. *East Texas Medical Center Cancer Institute v. Anderson*, 991 S.W.2d 55, 60 (Tex. App.—Tyler 1998, pet. rev. denied)(qualified privilege applies to communications made in good faith on any subject matter in which the author has an interest or with reference to which he has a duty to perform to another person having a corresponding interest or duty; plaintiff must prove actual malice); *Powell v. Foxall*, 65 S.W.3d 756, 763 (Tex. App.—Beaumont, 2001, no pet.)(application of official immunity to defamation claim).

Lambert is also entitled to summary judgment on Trirogoff's defamation claim. The only defamatory statement that Trirogoff alleges Lambert made was a letter he sent to her concerning providing anesthesia services. Deposition of Trirogoff, p. 18, line 20 - p. 19, line 15 (App. 167); Deposition Exhibit 27. Trirogoff's own deposition testimony shows that she has no evidence to support the essential element of publication to a third person. Trirogoff admits that she has no evidence that Lambert ever provided the letter to anyone other than her and she has no evidence that he made any other statement about the incident to any other person. Deposition of Trirogoff,

p. 9, line 22 - p. 11, line 17 (App. 165); p. 40, line 24 (App. 172) - p. 42, line 2 (App. 173). Further, the summary judgment evidence shows that Lambert made no statements of fact in the letter that are not substantially true. Deposition of Trirogoff, p. 19, line 16 (App. 167) - p. 23, line 3 (App. 168).

Plaintiffs have also failed to state a business disparagement claim. Plaintiffs must plead and prove the following elements to maintain an action for business disparagement: (1) the defendant published disparaging words about the claimant's economic interests; (2) the words were false; (3) the defendant published the words with malice; (4) the defendant published the words without privilege; and (5) the publication caused special damages. *Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 766-67 (Tex. 1987); *Granada BioSciences, Inc. v. Barrett*, 958 S.W.2d 215, 221 (Tex. App.—Amarillo 1997, pet. denied). Statements concerning a claimant's economic interest consist of comments on what the claimant is forced to sell, the claimant's financial position, or the character of the claimant's business. *Procter & Gamble Co. v. Amway Corp.*, 80 F. Supp. 2d 639, 669 (S.D. Tex. 1999), *rev'd on other grounds*, 242 F.3d 539 (5th Cir. 2001); *Dwyer v. Sabine Mining Co.*, 890 S.W.2d 140, 143 (Tex. App.—Texarkana 1994, writ denied). Plaintiffs have not pleaded, and have no evidence of, any facts describing economic interests that Lambert allegedly disparaged to any patients or that any alleged publication was without privilege.

F. INTERFERENCE WITH CONTRACT

Plaintiffs make two allegations regarding their interference with contract claims that are possibly asserted against Lambert. Plaintiffs allege that the Hospital, at the direction of Lambert and the Board, began requiring that all doctors who performed services at the Hospital designate

either Dr. Trirogoff or Chuck Flinko to provide their patients with anesthesia.[9] Plaintiffs' First Amended Complaint, pp. 10-11. Plaintiffs also allege that the license to the Borger Rural Health Clinic was "given" to Dr. Timmons, preventing the Plaintiffs from the ability of purchasing or using those facilities. Neither of these allegations states a claim for interference with contract. The elements of a claim for tortious interference with a prospective contract are: (1) a reasonable probability that the claimant would have entered into a contract or relationship with a third person; (2) that the defendant intentionally interfered with the relationship; (3) that the defendant's conduct was independently tortious or unlawful; (4) the interference was the proximate cause of the claimant's damages; and (5) the claimants suffered actual damage resulting from the interference. *See Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 723-26 (Tex. 2001). The elements of a claim for tortious interference with an existing contract are: (1) the claimant had a valid existing contract; (2) the defendant willfully and intentionally interfered with the contract; (3) the interference was a proximate cause of her injury; and (4) the claimant incurred actual damage or loss resulting from the interference. *See Prudential Ins. Co. v. Financial Review Servs.*, 29 S.W.3d 74, 77-78 (Tex. 2000). Furthermore, it is well established in Texas that a party cannot tortiously interfere with itself. *Am. Med. Int'l, Inc. v Giurintano*, 821 S.W.2d 331, 335 (Tex. App.—Houston [14th Dist.] 1991, no writ). Because agents and principals are treated as one person or entity under the law, agents and employees cannot be held liable for interfering with the principal's business matters. *Id.* at 335-36.

With regard to Trirogoff's claim, she has no evidence of an existing contract that was interfered with by Lambert. To the extent that she alleges that she had an existing contract with

---

[9] Plaintiffs allege that Chuck Flinko is a "Certified Registered Nurses Assistant." He is actually a Certified Registered Nurse Anesthetist.

the Hospital, Lambert, as an agent of the Hospital, legally could not have interfered with the contract with Trirogoff.   Further, she cannot prove that Lambert willfully or intentionally interfered with an existing contract or that his conduct was independently unlawful regarding an existing contract.   In her deposition, Trirogoff testified that the doctors were *asked* (as opposed to required) to designate an aesthesia provider and she acknowledged that she doesn't know whether it was required or recommended that the doctors designate an anesthesia provider. Deposition of Trirogoff, p. 46, line 9 - p. 47, line 17 (App. 174); p. 54, lines 4-14 (App. 176). She also admitted she has no evidence that the doctors were not free to change their mind about their designation.   Deposition of Trirogoff, p. 55, lines 2-15 (App. 176).   She further admits that she has no evidence that Lambert in any way influenced any of the doctors' choices regarding anesthesia provider.   Deposition of Trirogoff, p. 238, lines 2-13 (App. 222).   Thus, Trirogoff has no evidence that Lambert willfully or intentionally interfered with any existing contract or that his conduct was independently unlawful.   See *Hill v. Heritage Resources, Inc.*, 964 S.W.2d 89, (Tex. App.—El Paso, 1997, pet. rev. denied)(plaintiff must present "some direct evidence" of willful or intentional interference and interfering party must know of the existence of a contract or have knowledge of facts that would lead a reasonable person to conclude that a contract existed).   Further, even assuming that Trirogoff could present evidence of intentional interference by Lambert, he is entitled to judgment based on the defense of justification, in that he was justified in recommending or requesting that doctors at the Hospital designate a particular anesthesia provider in order to assure that someone was always available to provided needed anesthesia services, and to promote efficiency in the operating room.   This was a legitimate policy decision on the part of Lambert and certainly a "bona fide exercise" of his rights and responsibilities.   See Affidavit of Norm Lambert(App. 679, para. 28); Affidavit of George

Parsley(App. 904-907); *DBI Services, Inc. v. Amerada Hess*, Corp., 907 F.2d 506-08 (5th Cir. 1990). The summary judgment evidence shows that Lambert agreed with a recommendation to have the doctors designate a particular anesthesia provider because of earlier incidents where there was confusion in the operating room about who was providing anesthesia and because operating room staff need to know ahead of time who the anesthesia provider will be in order to adequately prepare for the procedure. Affidavit of Norm Lambert (App. 679, para. 28). This was a reasonable, good faith decision on Lambert's part and the summary judgment evidence shows that other reasonable hospital administrators could have made the same decision under the circumstances. Affidavit of George Parsley(App. 904-907). Therefore, Lambert is also entitled to official immunity on Trirogoff's claim of interference with contract. *See McCartney v. May*, 50 S.W.3d 599, 610 (Tex. App.—Amarillo, 2001, no pet.)

Lambert is entitled to summary judgment with regard to the allegation that the Borger Rural Health Clinic was given to Dr. Timmons. First, there is no evidence that this in any way interfered with an existing or prospective contract of any of the Plaintiffs. None of the Plaintiffs have alleged or presented evidence showing that they had a contract or prospective contract with anyone concerning the Borger Rural Health Clinic. Further, Lambert is entitled to judgment based on the defense of justification. Selling the Borger Rural Health Clinic to Timmons was a "bona fide exercise" of the Lambert's rights and responsibilities as the Hospital CEO and he had an equal or superior right in the Clinic to that of the other party. See Affidavit of Norm Lambert, (App. 673-674, para. 10); *DBI Services, Inc. v. Amerada Hess*, Corp., 907 F.2d 506-08 (5th Cir. 1990). It is not uncommon for rural hospitals to help newer physicians in the community build their practice. These efforts can help reduce the income guarantee amounts the Hospital has to pay to the new physicians. One reasonable way to do this is provide clinic directorships to qualified

newer physicians. Affidavit of Randall Young (App. 901-903). Thus, other reasonable administrators could have taken the same actions as Lambert in this regard and he is also entitled to official immunity on this claim.

Plaintiff Sangalang makes allegations concerning interference with contract. Plaintiffs' First Amended Complaint, p. 10. These allegations do not state a cause of action for interference with contractual relations against Lambert because Sangalang only alleges that unidentified employees refused a patient's request to contact him, without identifying the employees and he has no evidence of involvement by any Defendant. See Deposition of Sangalang, p. 144. line 16 (App. 111) - p. 147, line 13 (App. 112); p. 149, line 7 - p. 151, line 23 (App. 113).

G.     LAGRONE'S STATE LAW WRONGFUL TERMINATION CLAIM

LaGrone has no evidence to support a claim for wrongful discharge under state law. Because Texas is an employment-at-will state, there is no common law cause of action for wrongful discharge. See *Midland Judicial District Community Supervision and Corrections Department v. Jones*, 92 S.W.3d 486, 487 (2002). Further, LaGrone's allegations show that she does not meet the exception to the at-will doctrine as established by *Sabine Pilot Sevice, Inc. v. Hauk*, 687 S.W2d 733 (Tex. 1985), which is that the employee must have been fired for refusing to perform an illegal act. LaGrone alleges that she was asked to keep a sealed envelope in her safe, *which she did*. She then alleges that *after she turned it over to the Hospital's attorney*, she learned that it contained child pornography. Thus, under Plaintiff LaGrone's allegations, she was not terminated for refusing to perform an illegal act because she actually performed the questioned conduct. It was not until after she completed performing the questioned conduct that she claims to have become concerned over whether her conduct had been illegal. *See* Plaintiffs' First Amended Complaint, pp. 11-12; Deposition of LaGrone, p. 113, lines 15-18 (App. 254).

Additionally, any claim that LaGrone might be attempting to assert under the Texas Whistleblower Act is barred by limitations. A claim under the Whistleblower Act must be filed within 30 days after the employee's grievance is completed. Texas Gov't Code §554.006; *Rhodes v, City of Plano*, 991 S.W.2d 479, 481 (Tex. App.—Fort Worth, 1999, no writ)("After administrative procedures are exhausted, a public employee has 30 days to file a whistleblower lawsuit."). The administrative procedures regarding the employment action on LaGrone ended on June 7, 2001, when the Board voted on her grievance. Affidavit of Norm Lambert (App. 676, para. 19); Deposition Exhibit 18, p. 2 (App. 645). This lawsuit was filed approximately one year later, in June 2002.

H.    ABUSE OF PROCESS

These Plaintiffs have not alleged a cause of action for abuse of process because they have not pleaded the following elements or pleaded any facts showing that: (1) the Hospital Defendants made an illegal, improper or perverted use of the process, a use neither warranted nor authorized by the process; (2) the Hospital Defendants had an ulterior motive or purpose in exercising such illegal, perverted or improper use of the process; and (3) damage to the Plaintiffs as a result of such illegal act. *See Graham v. Mary Kay Inc.*, 25 S.W.3d 749, 756 (Tex. App.-Houston [14th Dist.] 2000, pet. denied). Plaintiffs are attempting to base their abuse of process claim on their allegations that Defendants have utilized the medical peer review process at the hospital "in order to harass Plaintiffs." Plaintiffs' First Amended Complaint, p. 13. An abuse of process claim, however, clearly contemplates the issuance and abuse of a legal process, such as a writ. Abuse of process involves "the malicious perversion of a regularly issued civil or criminal process...." *Tandy Corp. v. McGregor*, 527 S.W.2d 246, 249 (Tex. Civ. App.—Texarkana 1975, ref. n.r.e.)(emphasis added). "Texas has generally recognized a cause of action for abuse of

process where the original process, *such as a writ*, has been abused to accomplish an end other

than that which the writ was designed to accomplish. . . It is critical to a cause of action for

abuse of process that the process be improperly used *after it has been issued.*" *Bossin v. Towber*,

894 S.W.2d 25, 33 (Tex. App.—Houston [14th Dist.] 1994, writ denied) (emphasis added). The

fact that some Plaintiffs may have had their medical cases at the Hospital reviewed as a part of

medical peer review does not give rise to an abuse of process claim. Further, Plaintiffs have no

evidence that they have been served with any legal process outside of this litigation by any of the

Defendants. Deposition of Ed Quiros, p. 41, line 11 - p. 42, line 13 (App. 427); Deposition of

Sangalang, p. 295, line 11 - p. 296, line 9 (App. 149); Deposition of Holland, p. 217, lines 3-16

(App. 55); Deposition of Elston, p. 233, lines 13-18 (App. 355); Deposition of C.P. Quiros, p.

243, lines 15-24 (App. 592); Deposition of Trirogoff, p. 22, lines 3-12 (App. 217). Thus,

Plaintiffs have no cause of action for abuse of process.

I.      INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Plaintiffs have not alleged and cannot prove a cause of action for intentional infliction of

emotional distress because they have no evidence of acts that are so outrageous in character, and

so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as

atrocious, and utterly intolerable in a civilized community. *Twyman v. Twyman*, 855 S.W.2d

619, 621 (Tex. 1993). Plaintiffs make four allegations against Lambert related to their

intentional infliction claims. Plaintiffs allege (1) Lambert caused a memorandum to be written

on or about March 19, 2001 that stated female employees had complained of improper sexual

conduct by one or more medical staff members, the memo was addressed to all physicians but

only distributed to Plaintiff doctors without envelopes; (2) "[a]ll Defendants have caused

intentional infliction of emotional distress in their abuse of the peer review process set forth by

the Hospital"; (3) Lambert told the Board of Directors that Holland had committed acts of patient abandonment; (4) "Lambert and the Defendant Board Members committed extreme and outrageous conduct in changing Hospital policy to require all doctors who performed services at the Hospital designate a person to provide patients with anesthesia." Plaintiffs' First Amended Complaint, pp. 16-17.

Plaintiffs have no evidence to support their claim that Lambert intentionally inflicted emotional distress on them with regard to the March 19 memo. Even if this allegation were true, it would not rise to the level of intentional infliction of emotional distress. Plaintiffs, however, have no evidence to show that this allegation is true. See Deposition of Ed Quiros, p. 82, line 22 (App. 437) - p. 86, line 5 (App. 438) (admits he doesn't know whether Defendant physicians received the memo); Deposition of Sangalang, p. 185, line 4 (App. 122) - p. 191, line 3 (App. 123) (admits that his memo was in an envelope with his name on it and that Plaintiffs don't know whether doctors other than Plaintiffs received the memo or not).

Plaintiffs have no evidence to support their intentional infliction claim regarding peer review. As Plaintiffs acknowledge, the Hospital's policy concerning medical peer review was changed in early 2002. Affidavit of Norm Lambert (App. 677, para 23). This may very well have resulted in more cases being subjected to peer review than under the old policy. The Plaintiff physicians have no evidence, however, that they are being treated differently than other physicians at the Hospital with regard to peer review. Deposition of Dr. C.P. Quiros, p. 49, lines 5-17 (App. 544); Deposition of Dr. Ed Quiros, p. 69, line 20 - p. 70, line 14 (App. 434); Deposition of Dr. Trirogoff, p. 106, lines 6-13 (App. 189); Deposition of Dr. Elston, p. 65, line 11- p. 67, line 23 (App. 313); Deposition of Dr. Holland, p. 115, line 25 - p. 116, line 11 (App. 29); Deposition of Dr. Sangalang, p. 115, lines 5-19 (App. 104) - p. 121, lines 3-13 (App. 106).

Further, as stated above, Plaintiffs Holland, Elston, Trirogoff, Ed Quiros, and C.P. Quiros have had no adverse action taken with regard to their Hospital privileges. The only Plaintiff whose privileges have been affected in any way is Dr. Sangalang. Dr. Sangalang's courtesy privileges have currently been extended while his application for renewal of courtesy privileges is pending. The Hospital Medical Executive Committee and the current Hospital Board have deferred acting on Sangalang's renewal application because of complaints made by Hospital staff about his allegedly unprofessional behavior. Affidavit of Norm Lambert (App. 679-680, para. 29); Affidavit of Melody Henderson (App. 813). Thus, the summary judgment evidence does not show that Defendants committed intentional infliction of emotional distress regarding the peer review process.

Holland's allegation against Lambert does not state a claim for intentional infliction of emotional distress. As shown above, even assuming Lambert accused Holland of patient abandonment, this would not have been an unreasonable act by Lambert because, based on Holland's own admission, she very likely did abandon her patients when she left town without arranging for the usual call coverage. See Affidavit of George Parsley (App. 904-907).

Trirogoff's intentional infliction claim against Lambert also fails. As discussed above, Trirogoff has no evidence that Lambert in any way influenced the doctors' choice regarding anesthesia providers and she has no evidence that doctors were required, as opposed to requested, to designate a particular provider.

J.     OFFICIAL CAPACITY CLAIMS

As with federal law under §1983, a state law suit against a government official in his or her official capacity is a suit against the governmental entity, and to the extent Plaintiffs are asserting state law claims against the Board Member Defendants in their official capacity, those

claims are barred by sovereign immunity. See *Bagg v. University of Texas Medical Branch*, 726 S.W.2d 582, 584 (Tex.App.-Houston [14th District] 1987, writ refused n.r.e.)(sovereign immunity protects not only governmental entities, but also government officials sued in their official capacity). Plaintiffs have not alleged, nor have they presented any evidence showing a waiver of sovereign immunity under Texas law for their state law claims. There is no waiver of immunity under the Texas Tort Claims Act for the claims in this case because Plaintiffs have not alleged, nor do they have evidence of, an injury caused by a use or condition of tangible property. See Tex. C.P.R.C. §101.021; *University of Texas Medical Branch v. York*, 871 S.W.2d 175, 179 (Tex.1994).

K. PEER REVIEW/MEDICAL COMMITTEE IMMUNITIES

To the extent any of the Plaintiffs' claims are based on any reports or statements to, or any act, statement, determination or recommendation made during a proceeding of, a peer review medical committee, as those acts are defined by law, Lambert is immune from liability under the following provisions: Texas Occ. Code §161.001 et seq., particularly Tex. Occ. Code §160.010(a)-(c); the Health Care Quality Improvement Act, 42 U.S.C. §§11101, et seq., particularly 42 U.S.C. §§11111(a) and 11112; and, Texas Health & Safety Code §161.001 et seq., particularly Tex. Health & Safety Code §161.033.

WHEREFORE, Defendant Norman Lambert requests that this Court grant his Motion for Summary Judgment and order any and all further relief to which he may be entitled.

Respectfully submitted,

DAVIS & DAVIS, P.C.
C. Dean Davis, TBN 05464000
Mark A. Keene, TBN 00784375
9442 Capital of Texas Highway
Austin, Texas  78759
(512) 343-6248; 343-0121 FAX

By

A. Craig Carter
    State Bar No. 03918100


GIBSON, OCHSNER & ADKINS, LLP
Thomas C. Riney
Texas Bar No. 16935100
Todd O. Lafferty
 Texas Bar No. 00784431
701 South Taylor, Suite 500
Amarillo, Texas 79101-2400
(806) 372-4271; 378-9797


ATTORNEYS FOR DEFENDANTS
LAMBERT, O'KEEFE, HEADLEY, RIBEIRO,
FRERIKS, ZENI, WHEELER, AND
RULLMAN

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of this instrument was, this _21_ day of _March_ , 2003, served upon counsel of record in this cause by placing same in the United States mail, certified mail, return receipt requested, properly stamped and addressed as follows:

Damon Richards
Harding, Bass, Fargason, Booth,
St.Clair & Richards
1901 University, Suite 500
P.O. Box 5950
Lubbock, Texas 79408-5950

Alicia Wilde
ALICIA A. WILDE. P.C.
4113 Marathon Boulevard
Austin, Texas 78756

Bill Cornett
CORNETT LAW FIRM, P.L.L.C.
612 S. Van Buren
Amarillo, Texas 79101

Matthew Hand
BROWN & FORTUNATO, P.C.
P. O. Box 9418
Amarillo, Texas 79105

Barbara Bauernfeind
Hund & Harriger
4021 84th Street
Lubbock, Texas 79423

A. Craig Carter