IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

MAY – 9 2003

CLERK, U.S. DISTRICT COURT
By
                    Deputy

| | |
|---|---|
| DR. GERRY HOLLAND, DO | § |
| MS. CYNTHIA LaGRONE, | § |
| DR. ROMEO B. SANGALANG, MD | § |
| DR. STEVE ELSTON, MD | § |
| DR. JERRY STRECKER, PhD | § |
| DR. GLORIA TRIROGOFF, MD | § |
| DR. ED QUIROS, MD and | § |
| DR. C.P. QUIROS, MD | § |
| | § |
| *Plaintiffs* | § |
| | § |
| v. | § |
| MR. NORMAN LAMBERT, as | § |
| CEO of Golden Plains Community | § |
| Hospital and Individually, | § |
| DR. OTONIEL HUERTAS, | § |
| DR. JESSE PERALES, | § |
| DR. BRETT TIMMONS, | § |
| DR. WALLY MANN, | § |
| DR. JOHN A. RIBEIRO, | § |
| DR. BASIL A. YOUNIS, | § |
| DR. VIC MAZA, | § |
| DR. BARD ROGERS, | § |
| DR. CARMEN PURL | § |
| MS. KATHY O'KEEFE, | § |
| MEMBERS OF THE BOARD OF | § |
| GOLDEN PLAINS COMMUNITY | § |
| HOSPITAL MARK HEADLEY, | § |
| JOHN RIBEIRO, CONNIE FRERIKS, | § |
| TOM ZENI, JOE FRANK WHEELER, | § |
| PAUL RULLMAN, | § |
| KATHY WHELCHEL, and | § |
| MELODY HENDERSON, | § |
| Individually. | § |
| | § |
| *Defendants* | § |
| | § |

CIVIL ACTION NO. 2-02CV-0157J

## PLAINTIFFS' SECOND AMENDED COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Dr. Gerry Holland, Dr. Jerry Strecker, Ms. Cynthia LaGrone, Dr. C.P. Quiros, Dr. Ed Cuiros, Dr. Gloria Trirogoff, Dr. Steve Elston, and Dr. Romeo Sangalang (hereinafter referred to as "Plaintiffs") and file this, their Second Amended Complaint, and for their cause of action state:

1.   This Complaint includes a civil rights action for money damages arising under the First, Fifth, and Fourteenth Amendments to the United States Constitution and 42 USC § 1983 and 1985, claims under the Sherman Antitrust Act, 15 USC § 1, a claim for Cynthia LaGrone under Age Discrimination in Employment Act, 29 USC § 621, et seq., and state court causes of action under which this Court has pendent jurisdiction. Jurisdiction of this Court over the claims are predicated on 28 USC § 1331, § 1343, § 1367, § 1337,and the aforementioned constitutional and statutory provisions.

2.   At all times material hereto, Plaintiffs were residents of or were working in Hutchinson County, Texas.

3.   Defendants Mark Headley, John Ribeiro, Connie Freriks, Tom Zeni, Joe Frank Wheeler, and Paul Rullman were, at the time of filing the initial cause of action, members of the board of directors of Golden Plains Community Hospital, hereinafter sometimes "Defendant Board Members."

4.   Defendants Kathy O'Keefe, Kathy Whelchel, and Melody Henderson were employed by Golden Plains Community Hospital at all times material hereto.

5.   Defendant Norman Lambert, at all times material hereto, was the chief executive officer (CEO) of Golden Plains Community Hospital and was employed by Golden Plains Community Hospital in such capacity.

6.   Defendants Huertas, Perales, Timmons, Mann, Ribeiro, Younis, Maza, Rogers,

**SECOND AMENDED COMPLAINT**                                        **PAGE 2**

and Purl are doctors and physicians that work with, for, or in conjunction with Golden Plains Community Hospital, hereinafter sometimes "Defendant Doctors."

7.      The board of Golden Plains Community Hospital were responsible for the operation of the Hospital and determining the Hospital's program of services for the benefit of the citizens of Hutchinson County and all officers, employees, practitioners, and allied health professionals were subject to the board's control, direction, and removal.

8.      Defendant Lambert, as CEO of the Golden Plains Community Hospital, has the administrative responsibility for insuring that all employees, practitioners, and allied health professionals receive proper training concerning the constitutional rights of persons in the county, including the right of free speech, particularly the right to criticize public officials and policies; the right to protection of the civil laws and statutes of the state of Texas; the right to protection under the civil laws and statutes of the United States; the right to be free from invasion of personal and property rights; and the right to exercise any of these rights without retaliation by governmental personnel or agencies.

9.      The Hospital's board was ultimately responsible for the policies and procedures adopted and carried out by Golden Plains Community Hospital in connection with hiring, retention, control, direction, and removal of officers, employees, agents, practitioners, and allied health professionals.

10.     Defendants Huertas, Perales, Timmons, Mann, Ribeiro, Younis, Maza, Rogers, and Purl, at the time of filing the Original Complaint in this matter, were members of the Medical Executive Committee (hereinafter "MEC"), which is a peer-review committee organized by the hospital, consisting of doctors selected in accordance with the Hutchinson County Hospital District's bylaws and medical and dental staff bylaws for Golden Plains

**SECOND AMENDED COMPLAINT**                                              **PAGE 3**

Community Hospital.

## FACTUAL ALLEGATIONS

11.     Plaintiffs incorporate by reference allegations set forth above in paragraphs 1-10 as if fully restated verbatim.

### Part A.

12.     Plaintiffs Holland, Sangalang, Elston, Trirogoff, Strecker, Ed Cuiros, and CP Cuiros ("Plaintiff Doctors"), at the time of filing the original complaint held private practices in Borger, Hutchison County, Texas,

13.     The Plaintiff Doctors were recruited by the Borger Hospital between 1977 and 1994.

14.     Although such doctors received privileges to see, attend to, and treat patients at the Hospital, none of the Plaintiff Doctors, except Trirogoff, received any salary from the Hospital.

15.     Doctors Holland, Sangalang, Elston, Trirogoff, CP Quiros, and Ed Quiros were members of the MEC until December 31, 2001.

16.     In November 1996, the Hospital hired Defendant Lambert as its chief executive officer.

17.     In May of 1998, the board and Lambert decided to hire six more doctors and grant them guaranteed salaries between $165,000 and $350,000 per year, in addition to bonuses, paying some of their student loans, and paying offices and staff.

18.     However, five of the six doctors recruited left the Hospital at the end of one year.

19.     In the year of 2000, new doctors were recruited by Lambert once again with generous guaranteed salaries, bonuses, paying of student loans, paid offices, and paid staff.

20.     Due to numerous factors, including: (1) the manner in which Larry Langley, the chief financial officer, was handled, (2) the hospital's financial crisis, (3) the mishandling of the purchase of magnetic resonanie imaging machine, (4) the sale of the Borger Rural Health Clinic to Defendant Timmons for a negligible amount, (5) the termination of LaGrone, and other factors, the Plaintiffs became increasingly frustrated with the mismanagement of the Hospital and began speaking out.

21.     Lambert individually or through his agents threatened to fire hospital employees who spoke to the human resources office representative during office hours and told board members, including Plaintiff Strecker, they were prohibited from discussing things said in board meetings.

22.     When protests were made, Lambert and others in the control of Lambert attempted to prevent dissemination of information and all protests, and the board was complicit with such actions.

23.     On or about February 2, 2001, an interview with Defendant Ribeiro appeared in the newspaper, in which Ribeiro falsely stated that certain individuals or groups of individuals attempted to created turmoil for others, almost as if they secretly delighted in the misfortunes of others.  Such statement was made with reference to Plaintiff Doctors and others reading the article knew that such statement was directed at Plaintiff Doctors.

24.     On or about April 20, 2001, Defendant Lambert wrote an open letter in which he stated that "certain individuals," (which the readers understood referred to Plaintiff Doctors) had become criminal in their efforts to discredit the administration and Dr. Ribeiro, and further stated that those persons had lied and falsified documents and made accusations of trespassing.

25.     Plaintiffs Holland, Trirogoff, Elston, and Sangalang felt coerced and forced to

**SECOND AMENDED COMPLAINT**                                                      **PAGE 5**

change their status at the hospital from active privileges to courtesy privileges and have incurred a significant loss of income.

### Part B.

26.     On or about June 5, 2001, Defendants Huertas, Mann, Perales, Purl, Ribeiro, Rogers, Timmons, Maza, and Younis sent a letter to the Hospital board in which they falsely accused the then present members of the MEC of conspiring to exclude new doctors and working contrary to the welfare of their patients.

27.     A summary of the letter was published in the Borger News Herald on or about June 8, 2001.

28.     Defendant Bard Rogers published statements through the newspapers that the Plaintiffs Doctors were beginning to make the public aware of facts in order for their own personal gain, and defamed the Plaintiff Doctors.

29.     On or about February 2, 2001, an interview with Defendant Ribeiro appeared in the newspaper, in which Ribeiro falsely stated that certain individuals or groups of individuals attempted to create turmoil for others, almost as if they secretly delighted in the misfortunes of others.  Such statement was made with reference to Plaintiff Doctors and others reading the article knew that such statement was directed at Plaintiff Doctors.

### Part C.

30.     Plaintiff La Grone was employed by the Hospital since January 7, 1997, as risk manager and compliance officer.

31.     Plaintiff La Grone was an exemplary employee during her entire employment, earning many awards including the CEO award, the good attendance award in 1998, 1999, 2000, and 2001, the team of excellence award in 1997, and the CTC recognition award in 1998.

32.    On or about January 28, 2000, the chief financial officer, Larry Langley, resigned and Defendant Lambert refused to answer the questions of the board president as to why Langley resigned.

33.    Defendant Lambert approved Langley's resignation and awarded him severance pay.

34.    Shortly before Langley's resignation, Defendant Lambert brought LaGrone a sealed envelope, with instructions to leave it sealed, but to keep it and place it in her safe, and LaGrone did as she was told.

35.    Over a year later, on May 8, 2001, an article was published in the local newspaper exposing the reason for Langley's resignation.

36.    Only then did LaGrone realize that the envelope she had been given contained child pornography, and on or about May 9, 2001, contacted the Texas Nurses Association for advice concerning her duties and potential liability.

37.    On or about May 9, 2001, LaGrone informed Defendant Henderson, Lambert's assistant and chief operating officer, and the MEC about this matter and that it was LaGrone's intent to cooperate in any criminal investigation of the matter.

38.    On or about six days later, May 15, 2001, LaGrone was told that the position of quality/risk manager had been eliminated and she was terminated.

39.    LaGrone's job responsibilities and duties were assumed by Henderson.

40.    LaGrone was over 60 years of age and Henderson is less than 50 years of age.

41.    As a pretext, the Defendant Board Members and Defendant Lambert claimed there were financial reasons for eliminating the position; however, such matter was pretextual.

42.    LaGrone filed the claims for wrongful termination, retaliation, and termination

**SECOND AMENDED COMPLAINT**                                        **PAGE 7**

based on age and has received a Notice of Suit Rights from the EEOC and has thus taken all necessary prerequisites to bringing this suit.

## Part D.

43.     On or about September 4, 2001, Defendant O'Keefe, an employee of Golden Plains Community Hospital, filed a complaint with the Texas Department of Health, claiming an individual whose name she did not know had accused Dr. Strecker of being a "pervert" and that two other women had reported similar incidents, but did not state the names of the other women.

44.     No disciplinary action was taken by the Department of Health after duly investigating the allegations.

45.     On or about January 17, 2002, shortly after the previous fraudulent charges were dismissed by the Texas Department of health, Defendant O'Keefe induced another individual to make a complaint of sexual impropriety against Dr. Strecker.

46.     Dr. Strecker was on the Hospital board and was told repeatedly by Defendant Lambert that it was illegal to discuss any matters learned in the meetings of the Hospital board.

47.     Strecker was repeatedly reprimanded by other members of the Hospital board, which include Defendant Board Members, and was threatened with legal action by the hospital attorney, Leon Mitchell.

48.     Defendant Whelchel told others that Strecker was using marijuana.

## Part E.

49.     On or about September 12, 2001, Defendant Lambert told numerous individuals that Dr. Holland had committed acts which constituted abandonment of her patients on the previous weekend.

50.     Holland had no patients at the hospital on the weekend in question, and thus

**SECOND AMENDED COMPLAINT**                                          **PAGE 8**

Holland did not abandon her patients.

51.     On or about July 16, 2002, Defendant Whelchel sent a memo to the medical staff that Dr. Holland's patients were to be seen by the emergency department physician while she was away, but Dr. Holland had directly requested that her patients be referred to Dr. Bhatia and Dr. Sampat.

## Part F.

52.     On or about November 9, 2001, Defendant Henderson told others that Elston did not attend an Accredited Cardiac Life Support course, which was required in order to keep his hospital privileges in an attempt to have Elston's privileges revoked.

## Part G.

53.     On or about October 2001, Defendant Lambert told others that Plaintiff Trirogoff refused to treat a patient in emergency and breached her contract with the Hospital.

54.     Trirogoff was never requested to go to the Hospital to treat the emergency patient and such comments by Lambert were made in an attempt to discredit Trirogoff.

55.     On or bout 2001, the Hospital, at the direction of Lambert and the board, certified registered nurse assistant was employed by the Hospital to provide anesthesia.

56.     Lambert and the board required doctors to designate a person to provide patients with anesthesia, either Trirogoff, a medical doctor specializing in anesthesia, or the certified registered nurse assistant.

57.     Clients who required anesthesia were not given a choice as to whether to use a doctor or a nurse for this delicate procedure.

58.     Defendant doctors all chose the certified registered nurse assistant, rather than Dr. Trirogoff.

**SECOND AMENDED COMPLAINT**                                                    **PAGE 9**

## Part H.

59.     On or about 2001-2002, Defendant Henderson told others that Dr. Sangalang grabbed a nurses name tag and threw it and failed to provide patient care in attempt to subject Sangalang to peer review and loss of privileges.

60.     On or about October 29, 2001, a woman brought her injured son to the Hospital and requested an emergency room hospital employee to contact Dr. Sangalang, but such request was refused.

61.     On or about August 15, 2002, an individual was admitted to the Hospital with a possible heart attack and his mother asked the emergency room nurse to call Dr. Sangalang, and only after much pleading would the emergency room nurse call Dr. Sangalang.

## COUNT I (SECTION 1983 SUBSTANTIVE DUE PROCESS – RETALIATION)

62.     Plaintiffs incorporate by reference the allegations set forth above in paragraphs 1-61 as if fully restated verbatim.

63.     Defendants have retaliated against Plaintiffs in violation of Plaintiffs First Amendment right of free speech by punishing Plaintiffs for speaking out about matters of public concern.

64.     This specific form of retaliation is particularly egregious because much of the speech for which Plaintiffs have been punished relates to matters of public concern for the community, including telling the truth about serious incidents.  The Hospital, the Hospital board, and the CEO of the Hospital desired to cover up.

65.     The course of conduct of Defendants, and each of them, was performed under color of law.

66.     To punish Plaintiffs, the Defendants have embarked on a course of conduct to

**SECOND AMENDED COMPLAINT**                                                                 **PAGE 10**

deny Plaintiff Doctors' patients, to deny referrals of patients to Plaintiff Doctors, to discredit Plaintiffs, to impugn the reputation of Plaintiffs, and to negatively affect the income of Plaintiffs.

67.    The course of conduct has caused significant loss of income to Plaintiffs, as well as severe emotional distress.

68.    Trirogoff, Holland, Elston, and Sangalang were constructively forced to change their status of active privileges with the Hospital to a position of courtesy privilege, which has had a negative impact on their income.

69.    Sangalang's privileges were suspended, revoked, or terminated in February 2003.

70.    As a result of Trirogoff speaking out, Defendant Board Members, Defendant Lambert, and the Defendant Doctors conspired to bring in a certified registered nurse assistant in order to force Triorgoff out of the Hospital and in an attempt to force her out of the medical community in Borger, Texas.

71.    As a result of speaking out, Defendant Board Members and Defendant Lambert, in conjunction with the support and aid of Defendant Doctors terminated the employment of LaGrone.

72.    The Defendant Board Members, Defendant Lambert, and Defendant Doctors knew of the unconstitutional actions taken against Plaintiffs, participated in such actions, and the Board ratified the actions of the other Defendants due to their silence and failure to take action to prevent retaliation by the other Defendants against Plaintiffs.

73.    At all times material hereto, Defendants, and each of them, acted intentionally and with reckless disregard for and with deliberate indifference to the clearly established constitutional rights of Plaintiffs, including the rights of substantive and procedural due process, free speech, equal protection, as well as the constitutional protection not to be retaliated against

**SECOND AMENDED COMPLAINT**                                              **PAGE 11**

for the exercise of any of these rights.

74.     Additionally, there is a strong likelihood that inadequate policies or training programs or inadequate supervision in the areas of setting policies and enforcing policies in the proper implementation of policies would result in constitutional violations and deprivations. Despite such knowledge, Defendant Board Members did not adequately instruct and train its governmental employees, and Defendant Lambert did not adequately instruct and train its governmental employees.  As the direct and proximate result of the acts and omissions of the Defendants, Plaintiffs have suffered emotional trauma, embarrassment, humiliation, and distress.

75.     In performing the acts complained of above, the Defendants acted in bad faith and/or with malicious purpose.

76.     Defendant Lambert and Defendant Board Members had a duty to see that the employees, practitioners, and allied health professionals received proper legal advice and instruction and/or training regarding the constitutional rights of persons similarly situated to Plaintiffs, but breached this duty by failing to provide proper instruction and/or training in those areas and/or by affirmatively providing improper and unlawful legal advice and instructions to Defendants Whelchel, O'Keefe, Henderson, Huertas, Perales, Timmons, Mann, Ribeiro, Younis, Maza, Rogers, and Purl.

77.     Defendants Whelchel, O'Keefe, Henderson, Huertas, Perales, Timmons, Mann, Ribeiro, Younis, Maza, Rogers, and Purl made a deliberate choice to follow the illegal course of action.

78.     Plaintiffs seek monetary and exemplary damages within the jurisdictional limits of this Court for Defendants' violations as described in this Count.

**COUNT II (SECTION 1983 SUBSTANTIVE OF DUE PROCESS – DEFAMATION)**

79.     Plaintiffs incorporate by reference the allegations set forth above in paragraphs 1-78 as if fully restated verbatim.

80.     Defendants Lambert, Huertas, Perales, Timmons, Mann, Ribeiro, Younis, Maza, Rogers, Purl, O'Keefe, Whelchel, and Henderson made public statements about Plaintiff Doctors' professional and personal representations.

81.     The statements include, but are not limited to, those set forth in the factual allegations, all of which were directed at Plaintiff Doctors and are defamatory. The statements were false and were made with malice or reckless disregard for their truth or falsity.

82.     Such statements were made in retaliation for Plaintiffs' exercise of the First Amendment right to speak freely on matters of public concern.

83.     In addition to causing harm to Plaintiff Doctors' professional and personal reputations, the statements caused Plaintiff Doctors to lose substantial income.

84.     Plaintiffs seek monetary and exemplary damages within the jurisdictional limits of this Court for Defendants' violations as described in this Count.

## COUNT III (SECTION 1983 – PROCEDURAL DUE PROCESS DEPRIVATION OF PROPERTY INTERST)

85.     Plaintiffs incorporate by reference the allegations set forth above in paragraphs 1-84 as if fully restated verbatim.

86.     Plaintiffs Sangalang, Trirogoff, Elston, and Holland had a legitimate claim of entitlement to continue to have active staff privileges at the Hospital.

87.     This claim of entitlement arose from the policies and bylaws of the Hospital and the medical and dental staff bylaws and custom and usage in the hospital and community.

88.     Such claim of entitlement was to be governed by the Hospital bylaws and the medical and dental staff bylaws.

**SECOND AMENDED COMPLAINT**                                                      **PAGE 13**

89. Dr. Sangalang's privileges at the Hospital were terminated, suspended, or revoked on or about February 10, 2003.

90. The totality of the circumstances constituted an implied in law and/or implied in fact contract between Trirogoff, Holland, Sangalang, and Elston and the Hospital.

91. Such claim of entitlement described was sufficient to create a property interest protected by the Fourteenth Amendment Due Process clause.

92. No process – much less due process was accorded Plaintiffs Trirogoff, Holland, Sangalang, and Elston before being deprived of this property interest.

93. As a result, Defendants violated such Plaintiffs right of procedural due process under the Fourteenth Amendment.

94. Such Plaintiffs seek monetary and exemplary damages within the jurisdictional limits of this Court for Defendants' violations as described in this Count.

## COUNT IV (SECITON 1983 – PROCEDURAL DUE PROCESS – DEPRIVATION OF LIBERTY INTEREST)

95. Plaintiffs incorporate by reference the allegations set forth above in paragraphs 1-94 as if fully restated verbatim.

96. The actions of Defendants has deprived all Plaintiffs of their constitutionally protected liberty interest in their good business and personal reputations.

97. Due to the actions of Defendants, a stigma was placed upon Plaintiffs, Plaintiffs' businesses, and Plaintiffs' reputations.

98. The stigmatizing escalated to the level of placing on Plaintiffs a badge of infamy, public scorn, and the like.

99. The statements made by Defendants, and especially those placed in the newspaper, were false and subjected the Plaintiffs to public scorn and ridicule.

**SECOND AMENDED COMPLAINT**                                    **PAGE 14**

100.    No process – much less due process – was accorded Plaintiffs being deprived of their liberty interest.  As a result, Defendants violated Plaintiffs' right of procedural due process under the Fourteenth Amendment.

101.    Each and every Plaintiff seek monetary and exemplary damages within the jurisdictional limits of this Court for Defendants' violations as described in this Count.

### COUNT V (SECTION 1983 AND/OR SECTION 1985 – CONSPIRACY)

102.    Plaintiffs incorporate by reference the allegations set forth above in paragraphs 1-101 as if fully restated verbatim.

103.    All Defendants conspired with each other and/or with other persons to violate Plaintiffs' constitutional rights.

104.    The objectives of this extra judicial conspiracy were to unlawfully interfere with the Plaintiffs' right to free speech and conduct a lawful business, and such Defendants did retaliate against Plaintiffs and interfere with Plaintiffs' rights under color of law.

105.    The acts and omissions described herein were undertaken in furtherance of a conspiracy and resulted in each of the violations of Plaintiffs' constitutional rights described above.

106.    Each coconspirator is liable for the acts and omissions of all other coconspirators performed in the course of this conspiracy.

107.    Such unlawful conspiracy violates either 42 USC § 1983 or 42 USC § 1985, or both.

108.    Each and every Plaintiff seeks monetary and exemplary damages within the jurisdictional limits of this Court for Defendants' violations as described in this Count.

### COUNT VI (VIOLATION OF SHERMAN ACT)

**SECOND AMENDED COMPLAINT**                                                 **PAGE 15**

109. Plaintiffs incorporate by reference the allegations set forth above in paragraphs 1-108 as if fully restated verbatim.

110. The actions and omissions of Defendant Board Members, Headley, Ribeiro, Freriks, Zeni, Wheeler, and Rullman, and Defendant Doctors, Huertas, Perales, Timmons, Mann, Ribeiro, Younis, Maza, Rogers, and Purl, constitute violations of the Sherman Act, 15 USC § 1, et seq., and Plaintiff Doctors have been damaged thereby.

111. Golden Plains Community Hospital is the only hospital in Borger, Texas, and is the only hospital in Hutchison County, Texas.

112. The next closest hospital to Golden Plains Community Hospital is over 30 miles away in Pampa, Texas.

113. The Hospital purchases out of state medicines and supplies, as well as its revenues from out-of-state insurance companies.

114. Services provided are also performed for out-of-state patients and generate revenues from out-of-state sources.

115. Defendant Doctors' salaries are financially supported by the tax payers of Hutchinson County, Texas, while Plaintiff Doctors' salaries are not.

116. The Defendant Doctors and Defendant Board Members have entered into contracts that have an affect on interstate commerce.

117. Defendant Doctors and Defendant Board Members are participants in a conspiracy in restraint of trade or commerce.

118. Defendants Lambert, Defendant Board Members, and Defendant Doctors consciously conspired to hire new doctors and to thus force the Plaintiff Doctors out of business.

119. The potential harm that did or would ensue if the conspiracy were successful

**SECOND AMENDED COMPLAINT**                                      **PAGE 16**

would be either an unlawful purpose or an anticompetitive affect.

120.    Such conduct threatens to impair competition and to impair the free market.

121.    Should the conspiracy be successful as a matter of practical economics, there will be a reduction in the provision of medical services in the Hutchison County, Texas market.

122.    The actions and omissions of Defendants Lambert, Defendant Board Members, and Defendant Doctors involves a horizontal agreement.

123.    The activities and omissions of Defendant Lambert, Defendant Board Members, and Defendant Doctors imposes an unreasonable restraint of trade in the relevant market.

124.    Under the direction of Defendant Lambert and Defendant Board Members, the Hospital began requiring all doctors who performed service at the Hospital to designate a person to provide anesthesia to patients, thereby taking away the decision of the patients and leaving such decision to the doctors employed by Defendant Lambert and Defendant Board Members.

125.    Defendants Lambert and Defendant Board Members created an incentive with Defendant Doctors to prevent patients from utilizing the services of Plaintiff Doctors and that Defendant Doctors long-term financial stability would be increased and enhanced from the lack of any competition.

126.    Employees of Defendant Hospital under the direction and control of Defendant Lambert and Defendant Board Members schemed to refer patients to other physicians and away from Plaintiffs Sangalang and Holland.

127.    Defendant Doctors acted in a scheme to benefit themselves and retrain trade by attempting to exclude Plaintiff Doctors from practicing effectively at the Hospital.

128.    Part of the restraint by Defendant Doctors was accomplished by the misuse of congressionally regulated peer review process in which peer review of files indicate Holland has

**SECOND AMENDED COMPLAINT**                                          **PAGE 17**

had four files peer reviewed, Ed Quiros has had four files peer reviewed, Triorogoff has had two files peer reviewed, and Sangalang has had seven files peer reviewed, while at the same time the Defendant Doctors have not had their files peer reviewed, despite multiple reported allegations of serious medical occurrences on their parts.

129.    The actions of Defendant Doctors and Defendant Lambert are malicious.

130.    The immunity provisions of the Healthcare Quality Improvement Act, 42 USC § 11101, et seq., are not applicable in that Defendant Lambert and Defendant Doctors have taken illegitimate actions under the guise of furthering the quality of healthcare and such actions are really taken for anticompetitive purposes.

## COUNT VII (EQUAL PROTECTION)

131.    Plaintiffs incorporate by reference the allegations set forth above in paragraphs 1-130 as if fully restated verbatim.

132.    Plaintiffs Sangalang, Trirogoff, Ed Quiros, and CP Quiros are of Filipino descent and are over the age of 50.

133.    Plaintiff Holland is a female over the age of 50 and Plaintiff Elston is male over the age of 50.

134.    Defendant Lambert, Defendant Doctors, and Defendant Board Members violated Sangalang, Trirogoff, Ed Quioros, and CP Quiros' (hereinafter the Philippine Doctors) right to equal protection based on discrimination by race, national origin, and/or age resulting in the loss of or interference with tangible interests, privileges, and property rights.

135.    Defendant Lambert exhibited his dislike for persons of Filipino descent when he refused to allow Dr. Viola, a Filipino doctor, to be placed on the emergency room schedule and refused a locum sent by the recruitment agency, as he was also of Filipino descent.

**SECOND AMENDED COMPLAINT**                                                    **PAGE 18**

136.    Defendant Lambert's reason for refusing Dr. Viola was that Dr. Viola was not of their kind and/or did not fit in the community.

137.    Additionally, Defendant Zeni expressed to the Hospital Board that the Filipinos were greedy and worked under the table.

138.    The majority of the Defendant Doctors are all Caucasian men under the age of 50 and were recruited with guaranteed salaries between $165,000 - $350,000 per year, in addition to bonuses, student loan payoffs, paid offices, and staff.

139.    The Filipino doctors and Drs. Holland and Elston work as independent contractors with the Hospital and are paid directly by patients and only for work done and were not receive any guaranteed salaries, bonuses, paid offices, staff, or possible student loan payoffs.

140.    There was no rational basis for giving these exceedingly different agreements to The Defendant Doctors as opposed to the Plaintiff Filipino doctors, Drs. Holland and Dr. Elston.

141.    Defendant Lambert acted knowingly and directly participated in violating the Filipino doctors' rights to be free of discrimination.

142.    At all times material hereto, Defendant Lambert was acting as CEO of the Hospital and was subject to the direction and control of the Defendant Board Members.

143.    Defendant Board Members remained silent and thereby ratified the actions and omissions of Defendant Lambert.

144.    Defendant Lambert and Defendant Board Members were acting under color of state law in that the hospital district was formulated by state law, and that the Hospital is a hospital district.

145.    Filipino doctors and Drs. Holland and Elston were a protected class that were selectively treated differently than the Defendant Doctors, and the selective treatment was

**SECOND AMENDED COMPLAINT**                                                                                          **PAGE 19**

motivated by an intention to discriminate on the basis of impermissible considerations, including race, national origin, and ages to the Philippine doctors and ages of Drs. Holland and Elston.

146.   The actions of Defendant Lambert and Defendant Board constituted a discriminatory effect and they were motivated by a discriminatory purpose, that being race, national origin, and age.

### COUNT VIII (STATE TORT – BUSINESS DISPARAGEMENT)

147.   Plaintiffs incorporate by reference the allegations set forth above in paragraphs 1-146 as if fully restated verbatim.

148.   The actions and omissions of Defendants constitute business disparagement against the Plaintiff Doctors.

149.   Plaintiffs seek additional monetary damages within the jurisdictional limits of this Court for Defendants violations and omissions that constitute business disparagement, in that Plaintiffs have been damaged as a result of the decreased patients and decreased income.

### COUNT IX (STATE TORT – DEFAMATION)

150.   Plaintiffs incorporate by reference the allegations set forth above in paragraphs 1-149 as if fully restated verbatim.

151.   The statements as set forth hereinabove were published with reckless disregard of whether or not the statements were false.

152.   The statements as set forth hereinabove and hereinafter referred to Plaintiffs and others understood it as being directed at or referring to Plaintiffs.

153.   The statements made are defamatory.

154.   The statements made were false.

155.   Such statements were reasonably calculated to injure the Plaintiffs' reputations

**SECOND AMENDED COMPLAINT**                                                    **PAGE 20**

and thereby expose Plaintiffs to public hatred, contempt, ridicule, or financial ruin, to impeach the Plaintiffs' integrity and/or reputation, and was further calculated to injure the Plaintiffs in their office, in their profession, and in their occupation and thus constitutes libel per se and slander per se.

156. The statements were further in violation of the Civil Practice and Remedies Code of the State of Texas § 73.001, et seq., and thus constitute a statutory violation.

157. In the alternative, should it be determined such statements were not obviously hurtful on their face, such statements were made with innuendo and implication and were defamatory of Plaintiffs and each of them.

158. Such statements were made of public and private matters.

159. The statements made as to public matters involved political, social, or other concerns to the community.

160. Defendants knew or should have known the statements were false, but failed to investigate their accuracy or omitted relevant details from such statements.

161. In connection with the public issues, such statements were made with actual malice.

162. As the direct and proximate result of the defamatory statements, Plaintiffs have been damaged by lost, past, and future income and loss of earning capacity.

163. Plaintiffs are entitled to exemplary damages from each and every Defendant.

164. As to Plaintiff Doctors Holland, Ed Quiros, CP Quiros, Elston, Trirogoff, and Sangalang, the following constitute some, but not all, of the defamatory statements of Defendants:

     a. Defendant Doctors published on June 7, 2001, to approximately 60 people, a written letter on June 5, 2001, containing false and defamatory

statements, including but not limited to the following:

    i.    Plaintiff Doctors conducted an invalid physician survey.

    ii.    The Defendant Doctors promoted a community petition.

    iii.    Plaintiff Doctors were not handling their responsibility as outlined in medical staff bylaws, section 12.8(b).

    iv.    Plaintiff Doctors failed in their own clearly outlined duties.

    v.    Plaintiff Doctors were disrupted to the operations of the Hospital, including the welfare of the patients.

    vi.    Plaintiff Doctors were failing their primary duty.

    vii.    Plaintiff doctors were negligent of their clearly elucidated duties in favor of their self-serving agenda.

    viii.    Purl, as Chief of Emergency Room Department, mandates she should be on the MEC and thus necessitates active staff privileges.

    ix.    Plaintiff Doctors' inability on willingness to look after the general interest of the medical staff as it relates to patient care.

    x.    Plaintiff Doctors' failure to systematically evaluate the practice or performance through valid and reliable measurement systems based on objective and clinically sound criteria.

b.    A publication of a summary of such letter in the newspaper on or about June 8, 2001.

c.    On or about April 20, 2001, Defendant Lambert said that certain individuals had become criminal in their efforts to discredit the administration and Dr. Ribeiro, referring to the Plaintiff Doctors.

d.    On February 2, 2001, Ribeiro told the newspaper that "certain individuals were attempting to created turmoil for others" referring to the Plaintiff Doctors.

165.    As to Plaintiffs Holland, Elston, Strecker, Sangalang, and LaGrone, the following constitute some but not all of the defamatory statements:

a.    Defendant Lambert claimed on September 12, 2001, that Plaintiff Holland abandoned her patients.

**SECOND AMENDED COMPLAINT**                                        **PAGE 22**

b.  Defendant Henderson claimed Plaintiff Holland abandoned patients.

c.  On or about November 9, 2001, Defendant Henderson claimed Elston did not attend an accredited cardiac life support seminar.

d.  In October of 2001, Defendant Lambert said that Defendant Triorgoff refused to treat a patient with an emergency.

e.  Defendant Henderson claimed Sangalang demeaned a nurse, took her badge and threw it down, and failed to provide patient care.

f.  On or about September 4, 2001, Defendant O'Keefe filed a complaint with the Texas Department of Health against Strecker, claiming he was a "pervert."

g.  On or about January 17, 2002, Defendant O'Keefe schemed in order to have other individuals file a complaint against Dr. Strecker with the Texas Department of Health.

h.  Defendant Whelchel told Ken Ingram that LaGrone engaged in illegal activities that cost the Hospital substantial amounts of money.

## COUNT X (STATE TORT – TORTUOUS INTERFERENCE WITH CONTRACTS)

166.  Plaintiffs incorporate by reference the allegations set forth above in paragraphs 1-165 as if fully restated verbatim.

167.  Plaintiffs Holland, Elston, Trirogoff, and Sangalang maintained contracts with the Hospital implied in law or implied by fact.

168.  Defendant Whelchel willfully and intentionally interfered with the contract of Holland by sending a memo stating the emergency department physician was to see Holland's patients instead of Dr. Patia and Dr. Sanpat.

169.  Defendant Doctors willfully and intentionally interfered with the contracts of Plaintiff Holland, Elston, Triorgoff, and Sangalang by forcing them to be constructively placed on courtesy privileges, rather than active privileges.

170.  Defendant Doctors willfully and intentionally interfered with the contract of Dr.

**SECOND AMENDED COMPLAINT**                                          **PAGE 23**

Sangalang by constructively forcing him to be placed on courtesy privileges, and by maliciously revoking any privileges of Dr. Sangalang at the Hospital.

171.    Each interference set forth above was the proximate cause of injuries suffered by Plaintiffs Holland, Elston, Trirogoff, and Sangalang.

172.    Defendant Lambert interfered with contracts that Sangalang had with his patients, when the employees of the Hospital, under the direction and control of Lambert and Defendant Board Members were told that they could not call Dr. Sangalang to treat his patients.

173.    Plaintiffs Holland, Elston, Trirogoff, and Sangalang have incurred actual damages or losses resulting from the interference, including loss of past income and future income, and loss of earning capacity.

## COUNT XI (STATE COURT – INTERFERENCE WITH PROSPECTIVE CONTRACT)

174.    Plaintiffs incorporate by reference the allegations set forth above in paragraphs 1-146 as if fully restated verbatim.

175.    Defendant Doctors, Defendant Board Members, and Defendant Lambert intentionally interfered with relationships of the Plaintiff Doctors and their patients.

176.    There existed a reasonable probability that the Plaintiff Doctors would have entered into a contract relationship with additional persons and patients in Hutchison County.

177.    Defendant Doctors, Defendant Lambert, and Defendant Board Members' conduct was independently tortuous or unlawful and such interference was the proximate cause of the damages of Plaintiffs.

178.    In particular, Defendant Lambert and Defendant Board Members hired a certified registered nurse assistant to perform anesthesia services.

179.    In particular, Holland, Elston, Trirogoff, and Sanglang were not able to place as

**SECOND AMENDED COMPLAINT**                                                      **PAGE 24**

many patients in the Hospital as a result of being constructively placed on courtesy privileges, rather than active privileges.

180.   Plaintiff Sangalang, as a result of the actions of Defendant Doctors, was not allowed any privileges at the Hospital, and such actions of the Defendant Doctors was done maliciously.

181.   The Plaintiff Doctors have suffered actual damages resulting from the interference, including loss of past income, loss of future income, and the loss of earning capacity.

## COUNT XII (STATE CAUSE OF ACTION AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

182.   Plaintiffs incorporate by reference the allegations set forth above in paragraphs 1-181 as if fully restated verbatim.

183.   Defendants, and each of them, committed intentional or reckless conduct so extreme and outrageous that such has caused Plaintiffs, and each of them, severe emotional distress.

184.   Defendants knew or had reason to know that their activities would create a high degree of risk of harm to the Plaintiffs and deliberately proceeded to act in conscious disregard of or indifference to that risk to Plaintiffs.

185.   Such conduct was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency.

186.   As a direct and proximate result, the Plaintiffs have incurred headaches, difficulty sleeping and eating, stress, anxiety, and depression.

## COUNT XIII (WRONGFUL DISCHARGE)

187.   Plaintiffs incorporate by reference the allegations set forth above in paragraphs 1-

**SECOND AMENDED COMPLAINT**                                                                 **PAGE 25**

186 as if fully restated verbatim.

188.    Plaintiff LaGrone, in addition to her other causes of actions stated herein, also brings this claim for wrongful discharge, retaliation, and age discrimination.  Part C of the Factual Allegations is particularly incorporated herein.

189.    Plaintiff filed a charge of wrongful termination, retaliation, and age discrimination with the Equal Employment Opportunity Commission and thereafter received a notice of right to sue and the original complaint herein was filed within the necessary time lines in order to preserve this claim.

190.    All preliminary and conditional requirements to the bringing of this action have been fulfilled with the administrative agency.

191.    LaGrone was born on  September 4, 1937 date and is presently 65 years of age.

192.    On May 15, 2001, Defendant Board Members and Defendant Lambert terminated LaGrone's employment, and the job responsibilities were assumed by Defendant Henderson, a much younger person.

193.    Conduct of Defendant Board Members and Defendant Lambert in terminating LaGrone's employment and replacing her with a younger person was contrary to and in violation of the provisions of 29 USC § 623 and is of much of the employment decision concerning LaGrone was based, in whole or in part, on LaGrone's age.

194.    The conduct of Defendant Board Members and Defendant Lambert with respect to LaGrone constitute a willful violation of 29 USC § 623(a).

195.    As the direct and proximate result of the conduct of Defendant Board Members and Defendant Lambert in terminating LaGrone's employment on May 15, 2001, LaGrone has and will continue to lose the benefits of her employment, including, but not limited to, wages and

benefits.

196.    Such actions of Defendant Board Members and Defendant Lambert constitute disparate treatment of LaGrone.

197.    As a result of Defendant Board Members and Defendant Lambert's acts and omissions, it was necessary for LaGrone to retain the undersigned counsel to represent LaGrone in this cause of action.

198.    LaGrone was qualified for the job, is 60 years old or older, has been adversely affected by the actions and omissions of Defendant Board Members and Defendant Lambert.

199.    LaGrone obtained and was given a $10,000 a year raise in February 2001, only three months prior to her termination.

200.    LaGrone is entitled to back pay, front pay, liquidated damages, costs, and attorney's fees and reinstatement.

## COUNT IX (DAMAGES)

201.    Plaintiffs incorporate by reference the allegations set forth above in paragraphs 1-158 as if fully restated verbatim.

202.    As a direct and proximate result of the acts and omissions of Defendants hereinabove stated, Plaintiffs have suffered and continue to suffer serious emotional distress, humiliation, embarrassment, and physical manifestations thereof, and have suffered loss of business, loss of revenue, loss of income, loss of earning capacity, loss of property, and loss of respect in the community.

203.    Plaintiffs also seek exemplary damages from all Defendants.   Plaintiffs seek monetary damages from the Defendants, and each of them.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief against Defendants:

1.     For compensatory damages against each Defendant in an amount to be determined by the jury.

2.     For compensatory damages against the Defendants, jointly and severally, in an amount to be determined by the jury.

3.     For punitive and exemplary damages against each of the individual Defendants, severally, in an amount to be determined by the jury.

4.     Declaration that the policies as promulgated and put into effect by the Defendants violates the First, Fifth, and Fourteenth Amendment of the United States Constitution and § 1983.

5.     Monetary relief to the Plaintiffs from Defendants for Defendants' violations of Plaintiffs' constitutional and statutory rights.

6.     Attorneys' fees pursuant to 42 USC § 1988.

7.     For prejudgment and postjudgment interest.

8.     For all costs of court incurred by Plaintiffs to prosecute this action.

9.     For such other and further relief, both general and special, at law and in equity, as the Court may deem just and proper and to which Plaintiffs are justly entitled to receive.

Respectfully submitted,

HARDING, BASS, FARGASON, BOOTH,
ST. CLAIR & RICHARDS, L.L.P.
1901 University, Suite 500
P.O. Box 5950
Lubbock, Texas 79408-5950
(806) 744-1100
(806) 744-1170 Facsimile

By: _Damon Richards_

Damon Richards
State Bar No. 16845470

Robert W. St. Clair
State Bar No. 18985300

ATTORNEYS FOR PLAINTIFFS

**SECOND AMENDED COMPLAINT**                                    **PAGE 29**